[Cite as *State v. McDermitt*, 2022-Ohio-2422.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. Earle E. Wise, Jr., P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | |
| JASON ALLEN MCDERMITT | : | Case No. 2021CA0052 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:          Appeal from the Court of Common
                                                             Pleas, Case No. 2020-CR-2095




JUDGMENT:                                        Affirmed




DATE OF JUDGMENT:                        July 14, 2022




APPEARANCES:

For Plaintiff-Appellee                            For Defendant-Appellant

KYLE L. STONE                                   TY A. GRAHAM
PROSECUTING ATTORNEY               4450 Belden Village St. NW
                                                             Suite 703
By: Lisa A. Nemes                               Canton, OH  44718
110 Central Plaza South - Suite 510
Canton, OH 44702-1413

*Wise, Earle, P.J.*

{¶ 1} Defendant-Appellant Jason Allen McDermitt appeals the April 22, 2021 judgment of the Stark County Court of Common Pleas which reflects his conviction and sentence for one count of aggravated murder with a firearm specification and one count of menacing by stalking. Plaintiff-Appellee is the state of Ohio.

FACTS AND PROCEDURAL HISTORY

History Before the Murder of M.F.

{¶ 2} Before her murder, M.F. worked at FedEx Ground as an operations manager. McDermitt was a co-worker. M.F. worked an early shift which typically began between 2:30 and 3:00 in the morning. McDermitt worked the same schedule. When the two had worked afternoons, McDermitt befriended M.F., and became obsessed with her. He brought her food and drinks to her at work, surreptitiously photographed and took videos her, collected screenshots of her Snapchat posts using an app specifically designed to allow him to do so by circumventing Snapchat's protections against collecting screenshots, and talked about her incessantly to others giving the impression they were very close.

{¶ 3} In August 2020, McDermitt trained Mary, a new employee at FedEx Ground. Mary felt McDermitt never talked about anything other than M.F. He even showed Mary pictures of M.F. and her daughter. McDermitt's behavior was so obsessive Mary advised McDermitt he needed to stop his obsession with M.F. and find something better to do with his time. She also told McDermitt to stop texting her about M.F. McDermitt engaged in the same type of behavior with Mikki, another coworker. He talked to Mikki about M.F.'s

health, her hair, her daughter, and how he attended a birthday party at M.F.'s home. McDermitt texted and talked with both Mikki and Mary about M.F. outside of work hours.

{¶ 4} Mark was also a FedEx employee acquainted with McDermitt. McDermitt also talked about M.F. with Mark. He told Mark M.F. was a close friend and said he wanted to hang out with her more. When M.F. and her boyfriend J.S. went through a rough patch in their relationship, McDermitt told Mark that he and M.F. were possibly going to get a place together as roommates, but also expressed to Mark that he wanted more than friendship from M.F. But then M.F. and J.S. settled their differences.

{¶ 5} Four months before her murder, M.F. and her eight-year old daughter moved into a home on Frazer N.W. in Plain Township with J.S. and his daughter. Shortly thereafter, M.F. had a birthday party for her daughter. McDermitt attended with Mark. M.F.'s mother, C.R. was also present. C.R. had met Mark in the past, but not McDermitt. Because many of her friends and family members had not seen the home, M.F. was giving her guests tours of the home. M.F.'s mother noticed that McDermitt was introducing himself to everyone who arrived and then following along with M.F. during the tours. He helped put out food and called M.F.'s grandmother "grandma." C.R. talked to M.F. the following day about McDermitt's odd behavior and learned M.F. was very upset about it.

{¶ 6} On October 8, 2020, M.F. contacted C.R. extremely upset and crying about an incident at work. She told her mother that she had left her phone unattended and McDermitt and two other coworkers had taken the phone and gone through it. She stated McDermitt had first lied and said he had nothing to do with it, but then admitted he did. Thereafter, M.F. wanted nothing to do with McDermitt and told him as much. She further asked her mother for help finding another job, told Mark she wanted to change jobs,

blocked McDermitt on social media, and asked her boyfriend for help contacting FedEx human resources. The employees involved were disciplined. Following the phone incident, M.F. was the subject of continuing harassment at work.

{¶ 7} McDermitt, however, only became more obsessed with M.F. He tried to get Mark, Mary, and Mikki to talk to M.F. on his behalf. Despite M.F. making it clear she did not want to speak with him, he continued to text constantly and trying to call her. He also asked Mark, Mary and Mikki to read an apology letter he had written to M.F. All three noticed a change in McDermitt's demeanor following the phone incident. They observed McDermitt acting depressed, looking unkempt, and making it known he was not sleeping or eating properly. McDermitt continued attempts to communicate with M.F., but she rejected those attempts. The last communication between the two was on October 24, 2020 when McDermitt texted M.F. to ask how things were going in Columbus. M.F. responded, but only to ask McDermitt how he knew she was in Columbus.

{¶ 8} On October 28, 2020, M.F. was scheduled to begin work at 2:30 A.M. The night before, as per routine, M.F. dropped her daughter off at her C.R.'s home. Also per routine, C.R. awoke at 1:30 a.m. to call M.F. and make sure she was up. But C.R. noticed a text from M.F. stating she was already up, she loved C.R. and would call when she got off work.

{¶ 9} J.S. awoke briefly while M.F. was getting ready for work, but went back to sleep. He woke a second time at 6:00 a.m. and went to the kitchen to make breakfast. As he did, he noticed M.F.'s car was still in the driveway as was his own. Confused, he went outside to investigate. He discovered the driver's side door of M.F.'s car standing open

and M.F.'s lifeless body in the driver's seat. Her head and neck were bloodied by gunshot wounds yet J.S. had heard no gunshots. J.S. called 911.

{¶ 10} While that was going on, C.R. was awakened by a call from a friend who lived close to M.F. alerting her to the fact that police and EMS were present at M.F.'s home and had taped off the property. C.R. called FedEx and discovered M.F. was not there. She then went to M.F.'s home where she discovered her daughter was dead. She advised law enforcement officers present at the scene that she felt someone at FedEx was responsible.

McDermitt on October 28, 2020

{¶ 11} McDermitt clocked in at FedEx at 2:59 a.m. Mikki and Mary were both also working that morning and both noticed an improvement in McDermitt's demeanor. He appeared "happier," had "more spunk" and was even smiling for the first time in a while. McDermitt told Mary he and M.F. had started talking again and even showed her a photo of a Christmas gift he intended to buy for her. Mary was suspicious because she felt that if McDermitt and M.F. were actually talking again, McDermitt would have told her immediately. Mary noticed McDermitt looking toward where M.F. should have been working that morning. He commented that M.F. should be at work and he did not know where she was. Although McDermitt made it clear he was aware M.F. was scheduled to work that day, he did not appear concerned about her absence.

{¶ 12} McDermitt left work approximately 10:00 a.m. He stopped at Sheetz and despite the rainy weather, took his blue Ford Focus through the car wash. Video later obtained from Sheetz shows McDermitt running the Focus over the chassis wash twice before proceeding through the carwash and then going inside to get food.

{¶ 13} From Sheetz, McDermitt went to his parent's house to give his mother a birthday gift even though her birthday was in July. McDermitt had also been at his parent's home five days before. While he was there on October 28, he received a text from a friend containing a link to a Canton Repository story about the discovery of M.F.'s body in her driveway. McDermitt dropped his food on the floor, and began crying hysterically. He left his parent's home to go to his friend's house but returned shortly thereafter.

{¶ 14} Mikki woke up to numerous texts from McDermitt and the link to the Canton Repository story. She called McDermitt and found him extremely upset and crying. McDermitt told Mikki he and M.F. had just begun talking again. Like Mary, Mikki was suspicious of this claim as she also thought McDermitt would have told her right away. Their phone call was interrupted by someone at McDermitt's door. Mikki heard Stark County Sheriff's deputies announce themselves and ask if he was Jason McDermitt. McDermitt hung up.

{¶ 15} McDermitt also called Mary with the news. Mary asked McDermitt if he thought M.F.'s boyfriend murdered her and McDermitt replied he did not think J.S. would kill M.F. While Mary was gathering her thoughts as to how to respond, McDermitt abruptly ended the conversation.

McDermitt in the Days Following M.F.'s Murder

{¶ 16} Following M.F.'s murder, McDermitt stayed with his parents and asked his friends to be there with him. Mark thought it odd that McDermitt asked everyone over after deputies had been there to take DNA samples from him but McDermitt said he did not want to be seen as a monster.

{¶ 17} On October 30, 2020, deputies arrived with a warrant for McDermitt's father's guns and McDermitt's car. Mikki was present at McDermitt's parent's home on October 31, 2020 to help plan a candlelight vigil for M.F. in front of M.F.'s home. She noticed copies of the warrants for the guns and the car and they talked about it. McDermitt was very concerned about his car's "black box" because according to his mother, one of the deputies had told her the black box put him at the scene of the murder. McDermitt told his friends he had seen a YouTube video explaining that a vehicle's black box could be hacked. He further suggested his spare key may have been stolen by someone who used his car and later returned it.

{¶ 18} Mikki and McDermitt then went to Walmart to buy things for the vigil the following night. While there, McDermitt told Mikki about a sexual encounter he allegedly had with M.F. and went into explicit detail. McDermitt had never before mentioned to Mikki that there was any physical relationship between himself and M.F. He told Mikki it would now just be a happy memory rather than something he would masturbate to.

{¶ 19} The following day, Mikki picked McDermitt up to go to the vigil around 6:00 p.m. On the way there, McDermitt asked Mikki about the traffic cameras along the route. He wanted to know if they recorded all the time or just if a motorist was speeding. McDermitt had Mikki stop at Duncan Donuts where he purchased M.F.'s typical coffee order. He asked for a sticker on the cup to read "Rest easy [M.F.]." Also on the way, Mark called Mikki from the vigil and said M.F.'s mother and her daughter E. were at the house collecting E.'s belongings. Both were upset by the vigil as they did not know people were going to be at the house.

{¶ 20} C.R. and E. had collected a few of E.'s things from inside the house and returned to their car, by the time McDermitt had arrived. As E. attempted to close her car door, McDermitt inserted himself between the door and E. and sat sideways on the floorboard in front of E. McDermitt told E. how beautiful she was and that she looked just like her mother. He gave her a stuffed toy and told her to keep it forever because he did not want her to ever forget him. While this was going on, C.R. repeatedly told McDermitt to get out of her car, that they were upset by the crowd, and they needed to leave. McDermitt failed to comply with C.R.'s wishes until Mark intervened and told McDermitt to get out of the car. McDermitt demanded C.R.'s phone number and appeared completely unemotional.

{¶ 21} The following day, C.R. returned to M.F.'s home to finish gathering E.'s things. At some point she looked outside to see McDermitt present and standing near M.F.'s car kicking around the leaves as if he was looking for something. He was with another man. When confronted, McDermitt said they were there because the man he was with had not had the opportunity the night before to put a letter on the memory board erected for the vigil. The two remained for about 15 minutes.

The Investigation

{¶ 22} The morning of the murder, Stark County Sheriff's Deputy Christopher Connelly arrived on the scene of the murder to find EMS already present. He was advised M.F. was deceased. He observed M.F.'s body in the driver's seat of her car facing out with her feet on the ground outside the car. Her cell phone was at her feet. Connelly noted M.F. had head injuries and also noticed a bullet strike to the passenger-side door. He spoke with J.S. and photographed the scene. A .22 caliber bullet was removed from the

interior passenger door. J.S.'s hands were swabbed for gunshot residue, but later testing was negative for any residue. Deputies combed the immediate neighborhood for cameras and asked neighbors if they had seen or heard anything, but no one had. None of M.F.'s neighbors had cameras on their homes.

{¶ 23} Stark County Sheriff's Office Detective Rocco Ross was also at the scene and led the investigation into M.F.'s death. At the scene, Ross immediately noticed tire tracks near a white vinyl fence beside M.F.'s home and mud splatter on the fence as if someone had peeled out. Deputy Eric Brown, an accredited crash reconstructionist, was asked to examine the tracks and mud splatter. Brown later determined that the tracks and mud splatter found at the scene were consistent with McDermitt's Ford Focus' dimensions, tires, and front right drive wheel. McDermitt's vehicle was therefore capable of leaving the evidence found at the scene. Moreover, Brown noted the position from which the vehicle had been parked would have provided a view of M.F.'s front door, yet would have mostly hidden the car. Brown issued a 13-page report which was peer reviewed by another accredited crash reconstructionist.

{¶ 24} Brown also examined the restraint control module, what McDermitt called a "black box," on McDermitt's vehicle but was unable to download any information. The module usually only activates and records information upon a high-velocity event and only records five seconds of data at a time.

{¶ 25} When McDermitt's Focus was seized, Ross noticed the car was very clean for the weather and asked McDermitt if he had washed it recently. McDermit admitted he had washed it at Sheetz that morning and Ross obtained the video of McDermitt's visit to Sheetz showing him washing the underside of the vehicle twice. Sheriff's Office Civil

Division Supervisor and K9 handler Sergeant Michael Greene took Milo, a K9 explosives detection dog, to McDermitt's vehicle. Milo alerted to the presence of explosive residue odor in McDermitt's Focus, specifically on the driver's seat and the floor space between the driver's seat and the door. Milo was also utilized at M.F.'s home. He did not alert to the presence of explosives inside the home, on the perimeter of the home, or J.S.'s car.

{¶ 26} McDermitt gave Ross permission to look at his phone. Google locations on the phone showed the phone was at McDermitt's apartment from late afternoon on October 27, 2020 until McDermitt left for FedEx at 2:49 a.m. Ross also noted McDermitt's phone had an alarm set for 1:20 a.m. Due to the large volume of text messages on the phone, Ross collected the phone as evidence.

{¶ 27} McDermitt told Ross he did not own any guns but stated his father did. Ross talked to McDermitt's parents. McDermitt's father stated his guns were all accounted for. However, McDermitt's parents stated he had been in their home before M.F.'s murder to give his mother the belated birthday present and also there the day of M.F.'s murder.

{¶ 28} Ross reviewed North Canton traffic cameras near M.F.'s home and also business cameras along the route McDermitt would need to travel from his apartment to M.F.'s home. During the relevant time period traffic and business cameras show a Ford Focus with a bent front license plate. The vehicle appeared near M.F.'s home, travelling from Glenwood to South Main, to Schneider Street at 1:37 a.m. and then emerging from Schneider two minutes later. When McDermitt's Ford Focus was seized, Ross noted the front license plate was bent. A camera on a business near McDermitt's apartment also show a Ford Focus with a bent front license plate during the relevant time period leaving, returning, and then leaving again at a time consistent with McDermitt going for work.

{¶ 29} Both McDermitt's and M.F.'s phones were analyzed by the Bureau of Criminal Investigation. Information from the phones was placed on a disk by the Bureau which Ross then reviewed.

{¶ 30} The texts between McDermitt and M.F. confirmed the turmoil on October 8, 2020 following the phone incident. McDermitt apologized numerous times and indicated he wanted to meet up so they can talk about the matter. M.F. told McDermitt she did not want to meet up and talk. Rather, McDermitt could text anything he had to say. On October 18, McDermitt texted to thank M.F. for a Cash App money payment. She had paid him for food and drink he had previously purchased for her and brought to work. The same day McDermitt let M.F. know he was aware she had removed him from her Snapchat friends. He also mentioned this fact to others. The last communication between the two was on October 24, 2020 when McDermitt texted M.F. asking how things were going in Columbus. M.F. responded asking how he knew she was in Columbus. McDermitt texted back he was sorry and did not mean it but M.F. never responded. There was no further communication between the two.

{¶ 31} Both M.F. and McDermitt used Snapchat, a social media platform that allows users to share temporary photos with their friends. Snapchat alerts a user if someone tries to take a screenshot of any of their photos. McDermitt's phone, however, had an application on it that allowed him to take screenshots of Snapchat photos without triggering the alert. McDermitt's phone contained a collection of M.F.'s Snapchat photos, her Instagram photos, and photos he had taken of M.F. himself and without her knowledge.

{¶ 32} McDermitt's phone also contained a lengthy Skype conversation consisting of messaging back and forth between McDermitt and another Skype user. McDermitt's used the screen name just-monika69 and was messaging with someone using the screen name RyanC. McDermitt held himself out as a female married to another female and wrote fictitious stories of a sexual nature. In June of 2020, McDermitt introduced M.F. as a character in these stories. He wrote about this character on a near daily basis and incorporated M.F.'s Snapchat photos, her selfies, and a photo he had taken of M.F. in her kitchen. One of the stories McDermitt wrote was identical to the story McDermitt told Mikki of an alleged sexual encounter between he and M.F. when he and Mikki went shopping at Walmart.

{¶ 33} Dr. David Dolinak of the Cuyahoga County Medical Examiner's Office performed the autopsy of M.F.'s body. He found two gunshot wounds; one to the left side of her head near the top of her head, and the second behind her left ear. Either wound would have been fatal. Dr. Dolinak recovered three severely deformed .22 caliber bullet fragments. One was recovered from the left side of M.F.'s brain. The other two had exited her head and caught in her hair. Dr. Dolinak concluded M.F.'s cause of death was gunshot wounds to the head and her manner of death was homicide.

{¶ 34} Larry Mackey of the Canton-Stark County Crime Lab examined the bullets recovered from M.F.'s head and car door as well as four guns seized from McDermitt's father's gun safe. The seized guns were all .22 caliber and included a Ruger, a Chiappa Firearms, a Beretta and a Heritage Rough Rider. The Rough Rider was a revolver and the other three guns were semiautomatic. No shell casings were recovered from the scene which suggested the possibility a revolver was used.

{¶ 35} The bullet fragments recovered from M.F.'s brain and hair were too deformed to be useful in comparison. The bullet recovered from the interior passenger door of M.F's car permitted some comparison. The recovered bullet and fragments were all .22 caliber lubaloy-coated lead bullets. The surface of the bullet recovered from the door exhibited a right twist and six lands and groves which are the marks left on a bullet during its passage through the barrel of a gun.

{¶ 36} Mackey was able to exclude the Ruger, Chiappa, and Beretta handguns as guns that could have fired the bullet recovered from the door. The Heritage Rough Rider revolver, however, could not be excluded. While Mackey could not conclusively say it was the gun that fired the bullet, he also could not say it was not. While .22 caliber bullets were found at McDermitt's parent's home, none were lubaloy-coated.

The Charges and Verdict

{¶ 37} McDermitt was arrested for the murder of M.F. on November 4, 2020. On December 17, 2020, the Stark County Grand Jury returned an indictment charging McDermitt with one count of aggravated murder pursuant to R.C. 2903.01(A), and unclassified felony, with a firearm specification, and one count of menacing by stalking pursuant to R.C. 2903.211(A)(1), a felony of the fourth degree as the indictment alleged McDermitt trespassed onto the land or premises where M.F. lived, was employed, or attended school to commit the offense.

{¶ 38} McDermitt entered pleas of not guilty to the charges and elected to proceed to a jury trial which began on April 2, 2021 and concluded on April 8, 2021. The state presented the above outlined facts. McDermitt presented testimony from his parents and from his friend and coworker Daniel Spence.

{¶ 39} Spence testified McDermitt was not angry with M.F. over the phone incident but rather was upset with himself for betraying her trust. Spence also stated he saw McDermitt on the morning of October 28 and did not observe anything out of the ordinary. He alleged M.F.'s work schedule was not posted anywhere and McDermitt would not have known if M.F. was supposed to be working the morning of October 28, 2020.

{¶ 40} McDermitt's parents both testified that while McDermitt was familiar with guns and had frequently gone shooting with his father in the past, he had stopped shooting after having surgery on both of his wrists. According to his parents, following the surgery McDermitt did not possess the grip strength to discharge a firearm. McDermitt's father testified there was only one key to his gun safe and only he knew where the key was kept. Both parents testified McDermitt never kept his car clean.

{¶ 41} After hearing all the evidence and deliberating, the jury found McDermitt guilty of aggravated murder and the attendant firearm specification. While the jury found McDermitt guilty of menacing by stalking, it also found McDermitt did not commit the offense by trespassing on the land or premises where M.F. lived or was employed, reducing the charge to a misdemeanor of the first degree. McDermitt was subsequently sentenced to life without parole for aggravated murder, three years incarceration for the firearm specification to be served prior to and consecutive to his sentence for aggravated murder, and 180 days for menacing by stalking to be served concurrently with his sentence for aggravated murder.

{¶ 42} McDermitt filed an appeal and the matter is now before this court for consideration. He raises six assignments of error as follow:

I

{¶ 43} "THE APPELLANT WAS DENIED HIS RIGHT TO FAIR TRIAL DUE TO PROSECUTORIAL MISCONDUCT."

II

{¶ 44} "THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF A FICTIONAL CONVERSATION CREATED BY THE DEFENDANT ON SKYPE AS IT CONSTITUTED "OTHER ACTS" PROHIBITED BY EVIDENCE RULE 404."

III

{¶ 45} "THE TRIAL COURT ERRED WHEN IT REVERSED ITS RULING ON THE DEFENDANT'S MOTION IN LIMINE REGARDING THE FICTIONAL SKYPE CONVERSATION CREATED BY THE DEFENDANT."

IV

{¶ 46} "THE TRIAL COURT ERRED IN DENYING APPELLANT'S RULE 29 MOTION FOR ACQUITTAL REGARDING THE COUNT OF MENACING BY STALKING."

V

{¶ 47} "THE TRIAL COURT ERRED BY ADMITTING EVIDENCE OF AND ARGUMENT ABOUT "OTHER ACTS" PROHIBITED BY EVIDENCE RULE 404."

VI

{¶ 48} "THE TRIAL COURT'S FINDING OF GUILTY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WAS NOT SUPPORTED BY THE SUFFICIENT EVIDENCE."

I

{¶ 49} During oral argument, counsel for appellant withdrew this assignment of error as it relies entirely on evidence outside the record. We therefore do not consider the first assignment of error.

## II, III

{¶ 50} We address appellant's assignments of error II and III together as they are interrelated. In these assignments of error, appellant argues the trial court erred in admitting other acts evidence, specifically the Skype conversation, and further erred in reversing its previous ruling on the admissibility of the Skype conversation. We disagree.

## Applicable Law

{¶ 51} The admission or exclusion of evidence lies in a trial court's sound discretion "so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake County*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991); *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). In order to find an abuse of that discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 52} Evid.R. 404(B) states:

> (B) Other Crimes, Wrongs or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake

or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

{¶ 53} R.C. 2945.59 governs proof of a defendant's motive and states the following:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

{¶ 54} Both Evid.R. 404(B) and R.C. 2945.59 "preclude admission of other acts evidence to prove a character trait in order to demonstrate conduct in conformity with that trait." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 16. However, there are exceptions as set forth in Evid.R. 404(B). In *Williams* at ¶ 20, the

Supreme Court of Ohio set forth a three-part test for determining the admissibility of other acts evidence:

> The first step is to consider whether the other acts evidence is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence. Evid.R. 401. The next step is to consider whether evidence of the other crimes, wrongs, or acts is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B). The third step is to consider whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. See Evid.R 403.

{¶ 55} The granting or denial of a motion in limine is a tentative, interlocutory, precautionary ruling reflecting the trial court's anticipatory treatment of an evidentiary issue. *State v. Grubb*, 28 Ohio St.3d 199, 201, 503 N.E.2d 142(1986). It "is a motion directed to the inherent discretion of the trial court judge to prevent the injection of prejudicial, irrelevant, inadmissible matters into trial." *State v. Strait*, 5th Dist. Delaware No. 14 CAA 12 0081, 2015-Ohio-4264, 2015 WL 5968655, ¶ 24, quoting *Mason v. Swartz*, 76 Ohio App.3d 43, 55, 600 N.E.2d 1121 (6th Dist.1991). The granting or denying of a motion in limine is reviewed under an abuse of discretion standard of review. *Estate of*

*Johnson v. Randall Smith, Inc.*, 135 Ohio St.3d 440, 2013-Ohio-1507, ¶ 22. In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary, or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217 (1983). "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Huth v. Kus*, 5th Dist. Tuscarawas No. 2017 AP 06 0015, 2018-Ohio-1931, 113 N.E.3d 140, 2018 WL 2230727, ¶ 30, quoting *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

### Pretrial Proceedings

{¶ 56} McDermitt argues the trial court improperly permitted the state to introduce evidence of the Skype conversation between McDermitt, communicating as "just_monika69," and "RyanC." McDermitt's pretrial motion in limine asked the trial court to prohibit the introduction of any evidence that he stalked anyone other than M.F., the fantasy Skype conversation, pornographic photos, videos, and pictures saved on his phone, and recordings of Snapchat stories. McDermitt argued these things were unrelated to the charges. Motion in Limine, filed March 17, 2021.

{¶ 57} On March 19, 2020, the trial court held a hearing on McDermitt's motion in limine to exclude the Skype conversation at trial. Counsel for McDermitt sought to exclude the evidence as irrelevant, improper character evidence, and more prejudicial than probative. Transcript of hearing at 4. Counsel argued that while M.F. is included in this fictional story, no violence or threats were portrayed in the story. The state argued the

evidence was relevant to show McDermitt's obsession with M.F. and prove identity. *Id.* 18-20. The trial court took the matter under advisement.

The Skype Issue at Trial

{¶ 58} Following jury selection, the trial court made a provisional ruling on the Skype evidence. At that point the trial court appeared to believe the evidence consisted of video conversations and questioned how it could be authenticated. It further found the material was not inextricably related to the crimes, and that even if it did go to show identity, it was more prejudicial than probative. However, the trial court also found that if counsel for McDermitt opened the door, the evidence could come in on rebuttal. The trial court further advised the state that if it provided the Skype conversation for the court to review, the court's ruling could change. Transcript of Trial, April 2, 2021 (T. 4/2) 165-166.

{¶ 59} During McDermitt's cross-examination of Detective Ross, counsel for McDermitt questioned Ross regarding the fact that McDermitt did not just have photos of M.F. on his phone, but also had photos of other women. Transcript of trial, April 5, 2021 (T. 4/5), 204-205. Based on this questioning, the state argued counsel had opened the door for admission of the Skype material because the Skype material would prove McDermitt's focused obsession with M.F.  from June 27, 2020 to October 28, 2020. T. 4/5, 208-209. The trial court still declined to permit questioning on the evidence, finding it unduly prejudicial. T. 4/5 210-211. The state requested the trial court review the Skype material and the trial court agreed to do so.  T. 4/5 211.

{¶ 60} The following day, the trial court indicated it had reviewed the Skype material and found it did not contain records of video calls as court had initially assumed it did. The court found counsel for McDermitt had opened the door to admission of the

Skype material by bringing up the fact that McDermitt had pictures of other women on his phone, and further that the evidence was relevant to show motive and identity, particularly in this instance where the identity of the murderer is shown through circumstantial evidence. The trial court did, however, rule the Skype exhibit would not be provided to the jury and it would provide a limiting instruction on the information regarding the material. Transcript of trial, April 7, 2021 (T. 4/7) 9-10.

{¶ 61} The state then recalled Detective Ross to testify regarding the Skype material and focused solely on the material involving M.F. T. 4/7, 18-23. At the conclusion of Ross's testimony the trial court instructed the jury that it could only consider the information for the limited purpose of showing motive or identity. T. 4/7, 23-24.

Analysis

{¶ 62} First, as for McDermitt's argument that the Skype material was inadmissible other acts evidence admitted in violation of Evid.R 404(B), we note that the only portion the state was permitted to question Ross about  was that portion dealing with M.F. Specifically that in the months leading up to her murder, McDermitt included, on a near daily basis, a character in his fantasy stories with the same name as M.F., same physical description as M.F., and included photos of M.F. taken from M.F.'s Snapchat chats and those McDermitt took himself without M.F.'s knowledge. To establish motive and identity, the state sought to establish McDermitt's obsession with M.F. and M.F. alone in the months leading up to her murder. While McDermitt characterizes this evidence as irrelevant and sensational other acts evidence we find it is not other acts evidence but rather relevant direct evidence of the crimes charged.

{¶ 63} Next, McDermitt argues the trial court erred in reversing its ruling regarding the admissibility of the Skype material without explanation for the reversal which according to McDermitt constituted unfair surprise. We disagree.

{¶ 64} Within this argument, McDermitt acknowledges that a ruling on a motion in limine is a tentative, interlocutory, precautionary ruling subject to change. In this case the trial court specifically stated its ruling was subject to change if the door were opened for admission of the Skype material, and McDermitt does not dispute that fact. T. 4/2, 165-166. We thus find no error in the trial court's reconsideration or reversal of its initial ruling.

{¶ 65} Also within this argument, McDermitt appears to base his unfair surprise challenge upon the rules of discovery, noting that the purpose of the rules of discovery are to prevent surprise and the secreting of evidence favorable to one party. But McDermitt never alleged the state failed to provide him with the Skype material during discovery. Indeed, counsel for McDermitt filed his motion in limine to exclude the Skype evidence discovered on McDermitt's phone on March 17, 2021, well before trial. We therefore reject any argument that admission of the Skype evidence resulted in unfair surprise.

{¶ 66} Finally, McDermitt argues the trial court provided no explanation for reversing its previous ruling. The court's reasons, however, are contained in the trial transcript. Counsel for McDermitt questioned Detective Ross regarding the existence of photos of other women on McDermitt's phone in an attempt to demonstrate McDermitt was not obsessed with or focused solely upon M.F.  T. 4/5, 204-205. The state thereafter argued to the trial court that the Skype material was relevant to show McDermitt's focus was on M.F. alone from June 2020 through October 2020 and asked the trial court to

review the exhibit. T. 4/5, 208-211. The final day of trial, the trial court indicated it had reviewed the exhibit, that the exhibit was different from what the trial court had assumed it was, and that it was relevant to show identity or motive. It also specifically found counsel for McDermitt had opened the door by asking Ross about photos of other women on McDermitt's phone. T. 4/7, 9-10. It is apparent from the record that the trial court did not realize the material was relevant until after reviewing the material.

{¶ 67} Having found the Skype conversation was not other acts evidence, but relevant admissible evidence, and that the trial court did not err in reversing its initial ruling regarding the admissibility of the Skype evidence, we overrule McDermitt's second and third assignments of error.

V

{¶ 68} In his fifth assignment of error, McDermitt again raises a 404(B), R.C. 2945.59 challenge. In this assignment of error McDermitt argues the state asked one of his former FedEx managers if M.F. was the only person to make a complaint against McDermitt.[1] McDermitt provides no transcript reference for this alleged testimony thereby failing to comply with App.R. 16(D) which states:

> (D) References in Briefs to the Record. References in the briefs to parts of the record shall be to the pages of the parts of the record involved; e.g., Answer p. 7, Motion for Judgment p. 2, Transcript p. 231. Intelligible abbreviations may be used. If reference is made to evidence, the admissibility of which is in controversy, reference shall

---

[1] In this assignment of error McDermitt also mentions the Skype material. That matter, however, was addressed in its entirety in our analysis of the second and third assignments of error and will not be revisited here.

be made to the pages of the transcript at which the evidence was identified, offered, and received or rejected.

{¶ 69} "It is the duty of the appellant, not this court, to demonstrate [his] assigned error through an argument that is supported by citations to legal authority and facts in the record." *State v. Taylor*, 9th Dist. Medina No. 2783-M, 1999WL61619 at *3 (Feb. 9, 1999), App.R. 16(A)(7). "It is not the function of this court to construct a foundation for [an appellant's] claims; failure to comply with the rules governing practice in the appellate courts is a tactic which is ordinarily fatal." *Kremer v. Cox*, 114 Ohio App.3d 41, 60, 682 N.E.2d 1006 (1996).

{¶ 70} The federal courts have discussed the problems resulting when a party omits important information in its appellate brief noting; "[c]ourts are entitled to assistance from counsel, and an invitation to search without guidance is no more useful than a litigant's request to a district court at the summary judgment stage to paw through the assembled discovery material. 'Judges are not like pigs, hunting for truffles buried in the record.' " *Albrechtson v. Bd. Of Regents* (C.A.7, 2002), 309 F.2d 433, quoting *United State v. Dunkel* (C.A.7, 1991), 927, 955, 956. The Supreme Court of Ohio, in *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 843 N.E.2d 174, 2006-Ohio-903, at ¶ 13; has also noted:

> The omission of page references to the relevant portions of the record that support the brief's factual assertions is most troubling. Appellate attorneys should not expect the court "to peruse the record

without the help of pinpoint citations" to the record. *Day v. N. Indiana Pub. Serv. Corp.* (C.A.7, 1999), 164 F.3d 382, 384 (imposing a public reprimand and a $500 fine on an attorney for repeated noncompliance with court rules). In the absence of the page references that S.Ct. Prac.R. VI(2)(B)(3) requires, the court is forced to spend much more time hunting through the record to confirm even the most minor factual details to decide the case and prepare an opinion. That burden ought to fall on the parties rather than the court, for the parties are presumably familiar with the record and should be able to readily identify in their briefs where each relevant fact can be verified.

{¶ 71} In its response to this assignment of error, the state offers a suggestion as to which witness and question McDermitt might be referring to. In the interest of justice we will consider the state's suggestion. The state points to the testimony of McDermitt's own witness Daniel Spence and the state's cross examination of Spence regarding disciplinary action taken after the phone incident:

[The State]: Okay. Now you talk about his, his reprimand in this case?

[Spence]: Yes.

[The State]: If he did something like that again, you * * *that you would consider termination?

[Spence]: If the behavior occurred again, yes.

[The State]: I see. And how many times does he need to transgress

against women at FedEx before he would be terminated?

[Spence]: That's not a - - that decision came from out HR business

partner and her manager. I just followed the suggested discipline that

- - the disciplinary action they suggested.

[The State]: [M.F.] is the first person?

[Spence]: No, [M.F.] is not the first person.

[Counsel for McDermitt]: Objection.

The Court: Overruled.

{¶ 72} T. 4/7, 56-57.

{¶ 73} The state then moved on to other questioning.

{¶ 74} If this is the passage McDermitt is referring to, while McDermitt argues this line of questioning was the state's attempt to paint him as a stalker, it was also an incomplete line of questioning. There was no follow-up questioning by the state as to who had complained or about what. Therefore, no actual "acts" were introduced.

{¶ 75} The fifth assignment of error is overruled.


IV, VI

{¶ 76} We address McDermitt's fourth and sixth assignments of error together as they are interrelated. In his fourth assignment of error, McDermitt argues the trial court erred in denying his Crim. R. 29 motion for acquittal on the charge of menacing by

stalking. In his sixth assignment of error he argues his convictions are against the manifest weight and sufficiency of the evidence. We disagree.

Applicable Law

{¶ 77} We must first note that under these assignments of error McDermitt again fails to comply with App.R. 16(D) as he provides no citations to the record to support his factual assertions. Nonetheless, in the interest of justice, we address McDermitt's complaints.

{¶ 78} Crim.R. 29 governs motions for acquittal. Subsection (A) states the following:

> The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses. The court may not reserve ruling on a motion for judgment of acquittal made at the close of the state's case.

{¶ 79} The standard to be employed by a trial court in determining a Crim.R. 29 motion is set out in *State v. Bridgeman*, 55 Ohio St.2d 261, 381 N.E.2d 184 (1978), syllabus: "Pursuant to Crim.R. 29(A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as

to whether each material element of a crime has been proved beyond a reasonable doubt."

{¶ 80} On review for sufficiency, our task is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶ 81} On review for manifest weight, the reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

## Menacing by Stalking

{¶ 82} McDermitt first argues the trial court erred in denying his Crim.R. 29 motion for acquittal on the charge of menacing by stalking.

{¶ 83} Count two of the indictment charged McDermitt with menacing by stalking pursuant to R.C. 2903.211(A)(1) and (B)(2)(c). Those sections state in relevant part:

(A)(1) No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person. * * *

* * *

(B)(2) Menacing by stalking is a felony of the fourth degree if any of the following applies:

* * *

(c) In committing the offense under division (A)(1), (2), or (3) of this section, the offender trespassed on the land or premises where the victim lives, is employed, or attends school * * *.

{¶ 84} R.C. 2903.211 provides in relevant part:

(D) As used in this section:

(1) "Pattern of conduct" means two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents * * *

{¶ 85} R.C. 2903.211(D)(2) defines "mental distress" as any of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

{¶ 86} The statute does not define the term "closely related in time," but case law suggests the trier of fact should consider the evidence in the context of all circumstances of the case. *Middletown v. Jones*, 167 Ohio App.3d 679, 856 N.E.2d 1003, 2006-Ohio-3465 (12th Dist.). In determining whether a defendant's conduct constitutes a pattern of conduct, a court must take everything into consideration, "even if some of the person's actions may not, in isolation, seem particularly threatening." *State v. Dillard*, 10th Dist. October No. 18AP-178, 2018-Ohio-4842, 2018 WL 6433086, ¶ 17.

{¶ 87} At trial, in response to McDermitt's Crim. R. 29 motion, the state argued the incidences establishing a "pattern of conduct" included the incident on October 8, 2020 when coworkers including McDermitt took M.F.'s phone and looked through it and McDermitt's presence at M.F.'s home on October 28, 2020 to murder her. T. 4/7, 38-39. The state argued "everyone knew she was upset, and the last text he sent her was asking her about being in Columbus, she was asking how he knew about that. And I can imagine that as she is being shot, that one of the last things she's thinking is that she's fearful of this man, and that is mental distress." *Id.*

{¶ 88} Based upon the record before us, we find reasonable minds could reach different conclusions as to whether each material element of menacing by stalking had

been proven beyond a reasonable doubt. The trial court did not, therefore err in denying McDermitt's Crim. R. 29 motion for acquittal on the menacing by stalking charge.

{¶ 89} As for whether the state ultimately produced sufficient evidence to support McDermitt's conviction for menacing by stalking, here on appeal, the state argues the record is replete with evidence of McDermitt's inappropriate and obsessive behavior. But the state also argues, as it did before the trial court, that a pattern of conduct was established with the phone incident and McDermitt's presence in at M.F.'s home to murder in her driveway.

{¶ 90} But by failing to make the finding that McDermitt trespassed onto the land where M.F. lived, the jury necessarily rejected the state's argument that McDermitt's presence at M.F.'s home the morning of the murder constituted a second incident of stalking. The jury instead convicted McDermitt of misdemeanor menacing by stalking under R.C. 2903.211(A)(1).

{¶ 91} Even so, we find the state produced sufficient evidence to support McDermitt's conviction for misdemeanor menacing by stalking. M.F.'s mother C.R. testified regarding McDermitt's bizarre behavior during the August 7, 2020 birthday party for E., including following M.F. closely while she gave friends and family tours of her new home, seemingly inserting himself as family by introducing himself to everyone who walked in and referring to M.F.'s grandmother as "grandma." T. 4/5, 10-12. C.R. talked to M.F. the following day regarding McDermitt's behavior and testified M.F. was upset about it. T.4/5, 12. Two months later, M.F. called C.R. crying hysterically because three coworkers including McDermitt had taken her phone and gone through it. C.R. testified M.F. wanted nothing to do with McDermitt thereafter. T. 4/5, 12-15. M.F. was so upset

she asked her mother and J.S. to help her find a new job and to contact FedEx human resources department. T. 4/5, 27, 50. McDermitt continued attempting to contact M.F. despite M.F. clearly telling McDermitt she no longer wished to speak to him. T. 4/5, 28, state's exhibit 17. A few days before her murder McDermitt texted M.F. asking about her trip to Columbus when M.F. had not shared any information regarding her whereabouts with McDermitt. T. 4/5, 154, state's exhibit 17. McDermitt also let M.F. know he was aware she had removed him from her Snapchat friends. *Id.*

{¶ 92} While McDermitt argues there was no evidence M.F. suffered mental distress, not only did the jury have the forgoing evidence to consider, but the trier of fact can also refer to its own experiences to determine whether the defendant's conduct caused the emotional distress. *State v. Bilder*, 99 Ohio App.3d 653, 665, 651 N.E.2d 502 (9th Dist. 1994).

{¶ 93} Upon review of the entire record and in a light most favorable to the prosecution, we find the state produced sufficient evidence to support McDermitt's conviction for misdemeanor menacing by stalking and further find the jury did not lose its way in convicting McDermitt of the same.

Aggravated Murder

{¶ 94} McDermitt was convicted of count one of the indictment, aggravated murder pursuant to R.C. 2903.01(A) which provides "[n]o person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy." The count also contained a firearm specification.

The Evidence

{¶ 95} The state presented evidence demonstrating McDermitt was obsessed with M.F. He spoke incessantly about her to others, subverted Snapchat photo protections to collect photos of M.F., took his own photos and videos of M.F. without her knowledge, collected her photos posted on Instagram, and used M.F. and her photos as a character in his Skype fantasy conversations with RyanC. T. 4/5 155, 161, T. 4/6, 135, 191-192, 232, 239-240, 244, 285.

{¶ 96} The state then presented evidence of the phone incident at FedEx, the resulting discipline by FedEx, M.F.'s desire to completely sever any relationship with McDermitt, and McDermitt's depression over the matter. T. 4/5 49, 70, 152-154; T. 4/7, 50; states exhibit 17. McDermitt begged friends to talk to M.F. on his behalf, but none did. T. 4/6, 138, 200-201.

{¶ 97} The jury heard further that McDermitt knew M.F.'s work schedule. He knew she was scheduled to work on October 28, 2020, knew where she lived, and approximately when she would need to leave for work. T. 4/6 204, 249.

{¶ 98} Additionally, the jury heard (1.) McDermitt's car was consistent with the mud splatter and tire track evidence left at the scene; (2.) that McDermitt carefully washed the underside of his car the morning of the murder; (3.) that traffic and business cameras captured images of a vehicle like McDermitt's in the vicinity of M.F.'s neighborhood and leaving and returning to his own neighborhood during the relevant time period; (4.) that the murder weapon could have come from McDermitt's father's gun collection; and (5.) explosives odor was detected by an explosives K9 in McDermitt's car. T. 4/6, 36, 40-41, State's exhibit 27; T. 4/5, 119, state's exhibit 6; T. 4/5, 123-126,140-142, state's exhibits 7, 8, 9, and 10 A-C; T. 4/6, 245, 248-249; T. 4/6, 97, 101, state's exhibit 26 A-D.

McDermitt's Arguments

{¶ 99} McDermitt does not challenge any one element of the charge. Instead he points out (1.) J.S withdrew consent to search his home while McDermitt gave consent to search his apartment, car and home; (2.) when given the opportunity to implicate J.S., McDermitt stated J.S. was not capable of killing M.F.; (3.) there may have been another FedEx employee suspect; (4.) M.F. and J.S. had a rocky relationship history; (5.) J.S. claimed he did not hear gunshots; (6.) McDermitt's father did not possess lubaloy-coated bullets; (7.) the gun seized from McDermitt's father could not be matched with complete certainty to the bullets recovered from the crime scene; (8.) due to surgery on both his wrists McDermitt was incapable of discharging a firearm; (9.) M.F. could have attracted the attention of other suspects by selling photos of herself online; (10.) Detective Ross initially made a mistake in identifying one of the vehicles appearing in the traffic camera videos as being McDermitt's blue Ford Focus; (11.) the Ford Focus is a common car.

{¶ 100} But the jury heard all of this evidence. The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess each witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * *such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig*, 10th Dist. Franklin No. 99AP-739, 1999 WL29752 (Mar 23, 2000) citing *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP–604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No.

02AP-1238, 2003-Ohio-2889, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).

{¶ 101} Although we recognize the evidence here was circumstantial, we note that circumstantial evidence has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 272, 574 N.E.2d 492 (1991), paragraph one of the syllabus, superseded by state constitutional amendment on other grounds as stated in *State v. Smith*, 80 Ohio St.3d 89, 102 at n.4, 684 N.E.2d 668 (1997). Circumstantial evidence is that which can be "inferred from reasonably and justifiably connected facts." *State v. Fairbanks*, 32 Ohio St.2d 34, 289 N.E.2d 352 (1972), paragraph five of the syllabus. "[C]ircumstantial evidence may be more certain, satisfying and persuasive than direct evidence." *State v. Richey*, 64 Ohio St.3d 353, 1992-Ohio-44, 595 N.E.2d 915. It is to be given the same weight and deference as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991).

{¶ 102} Upon review, we find McDermitt's aggravated murder conviction and attendant firearm specification is supported by sufficient evidence and is not against the manifest weight of the evidence.

{¶ 103} The fourth and sixth assignments of error are overruled.

{¶ 104} The judgment of the Stark County Court of Common Pleas is affirmed.


By Wise, Earle, P.J.

Wise, J., J. and

Delaney, J. concur.

EEW/rw