[Cite as *State v. Sheppard*, 2025-Ohio-161.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Patricia A. Delaney, P.J. |
| Plaintiff-Appellee | : | Hon. William B. Hoffman, J. |
| | : | Hon. Andrew J. King, J. |
| -vs- | : | |
| | : | Case No. 2024 CA 00017 |
| | : | |
| TRAMEL ANTWAN SHEPPARD | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:        Appeal from the Stark County Court of
                                Common Pleas, Case No. 2023 CR
                                0505


JUDGMENT:                       Affirmed


DATE OF JUDGMENT ENTRY:         January 21, 2025


APPEARANCES:


For Plaintiff-Appellee:                   For Defendant-Appellant:

Vicki L. DeSantis, Assistant Prosecutor   D. Coleman Bond
110 Central Plaza South, Suite 510        116 Cleveland Ave. N.W., Suite 300
Canton Ohio 44702                         Canton, Ohio 44702

*Delaney, P.J.*

{¶1} Defendant-Appellant Tramel Antwan Sheppard has appealed from the Judgment Entry of the Stark County Court of Common Pleas in which he was convicted of menacing by stalking and criminal trespass. Plaintiff-Appellee is the State of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} Defendant was indicted on one count of Menacing by Stalking in violation of R.C. 2903.211(A)(1)(B)(2)(e), a fourth degree felony, and one count of Criminal Trespass, in violation of R.C. 2911.21(A)(3)(D)(1), a fourth degree misdemeanor. The charges stem from acts towards a woman referred to as "T.R." in this Opinion.

{¶3} Defendant and T.R. were introduced by a mutual friend in 2022 when they worked together at a snack food manufacturer in Massillon, Ohio. The two worked in different departments but would talk when Defendant came to T.R.'s station or when they would see each other around the facility. T.R. initially considered him a work friend. They did not socialize outside of work. Although Defendant gave T.R. his phone number, she never gave hers to him.

{¶4} At one point, T.R. asked Defendant to give her a ride home from work. She gave him her address so he would know where to drop her off. She felt comfortable doing that because she knew she was moving soon after and would not be giving Defendant her new address.

{¶5} On the ride to her home, they talked about their churches and Defendant told T.R. about a difficult experience he had at the church he was attending. T.R. told him that he could come to her church. She gave him the church's location and the phone

number. Defendant began coming to T.R.'s church and attending the Sunday service and a midweek bible study.

{¶6} Soon after he gave her the ride home, Defendant began to make T.R. feel uncomfortable at work. He asked her twice to go on dates. She declined the requests and told him she "was in a relationship with God." He began following her around and talking to her, even when she asked him to stop. Although she did not take her break at a scheduled time, he would be outside to meet her whenever she went on her break. He asked her if she wanted to have sex and she said no. Defendant once told T.R. that he couldn't see his children because he was going to ask T.R. to marry him.

{¶7} On one occasion, T.R. fell asleep during a break and awoke to find Defendant standing over her massaging her shoulders. She "shoved him off" and told him to get away from her. He asked "you don't like that?" and she responded "no." She was upset at the time because the unwanted touching made her feel scared and uncomfortable. She wanted Defendant to stay away from her.

{¶8} T.R. stated that the unwanted behavior at work continued. She told her supervisor and human resource department about the events. When he continued to come to her workstation, she reported the behavior again. Defendant was fired from his job in August 2022 for his conduct. He continued, however, to attend church.

{¶9} The church was attended by T.R.'s family and had been part of T.R.'s life for approximately 20 years. Pastor Anicia Ann Brown, "took her in" when T.R. was around 13 years old because T.R.'s mother had died from cancer. T.R. was an usher at the Sunday service.

{¶10} Around the end of September or beginning of October, Defendant came up to T.R. in the middle of a service and said he needed to talk to her "about us." She shook her head no, but he continued. A cousin intervened to get her away from him and Defendant followed them out until the bishop pulled him aside.

{¶11} According to Pastor Brown, there was nothing out of the ordinary with Defendant when he first attended the church. Soon after, however, his behavior changed and several incidents occurred. At a service, she witnessed Defendant walk up to T.R. as she was standing alone while serving as an usher. He said something to her and T.R. looked afraid. Pastor Brown noticed that he made T.R. very uncomfortable. On another occasion, Pastor Brown had placed a crown on a special chair in the pulpit. Defendant walked up to the pulpit and said to Pastor Brown "that's my crown, I'm God."

{¶12} One Sunday, the church was having a testimony service. Defendant got up in front of the congregation to testify and he asked T.R. to marry him. She said no. She described being mortified at this unwanted behavior. Pastor Brown reiterated to Defendant that the answer was no.

{¶13} T.R. was afraid of Defendant and began staying home rather than attending church if he was there. The congregation knew T.R. did not want to be around Defendant and someone would call her to let her know if he was in attendance.

{¶14} Although T.R. had to stop going because of Defendant's behavior, incidents continued to occur. Pastor Brown described another service during which Defendant removed his shirt. He began using swear words and showing his tattoos. Pastor Brown perceived his actions as a threat and men from the church came to help get him calmed

down. She told him she did not want to call the police and that he should "just stop coming here." She said she told him that "several times."

{¶15} Pastor Brown did eventually call the police "a couple of times." Based on Defendant's behavior and T.R.'s reaction, she was very concerned for T.R.'s safety.

{¶16} In December 2022, T.R. learned that Defendant had posted about her on Facebook on two separate occasions. Defendant had previously sent T.R. a request to be his friend on Facebook, which she declined to accept. On December 6, 2022, he posted "Okay, [T.R.], I get that you want to be the only girl which you are. I'm leaving on Monday to California I want you on the plane with me. I may be a dog that barks at other females but my loyalty is with you. I figured I'd let you know how I feel before I leave town." On December 10, 2022, he posted "I need somebody to talk to I'm bored and horny . . . sooooo [T.R.]"

{¶17} T.R. was made aware that same month that Defendant had posted a video on Facebook referring to her. Despite being asked not to return to church, Defendant filmed himself walking on church property and posted it on Facebook. Defendant could be seen walking around the property in an agitated state. As he filmed the front door of the church and a car in front of it, he referred to T.R. as "the devil" and saying "See the devil? Look she's hiding from the camera. See the devil?" He claimed that he was "all under her spell" and that she "disturbed my peace." He referred to her as a "bitch." In addition to Defendant identifying T.R. by her name and using profanity, he said he "bet she die a virgin, guaranteed." He also stated that "she got me fired from my job."

{¶18} In the video, Defendant also acknowledged that he had been previously asked to leave the church. He repeated the statement they "kicked me out of the church"

and then added but "now I'm back." He referenced the incident where he took his shirt off and that they were offended by it. He claimed "shit real serious over here."

{¶19} On December 19, 2022, T.R. contacted the Canton Police about Defendant's behavior. On December 25, 2022, T.R. received a call that Defendant was at church, and she should not come. T.R. had been planning to go with her grandmother to the Christmas service but did not want to attend if Defendant was there because she did not know "what he would do." She was informed that "he was getting aggressive" and she was afraid of him.

{¶20} T.R. took steps to protect herself, including getting pepper spray and firearms. She was concerned about possible physical harm from Defendant. She felt his behavior was getting more aggressive as the months went on. She sought counseling from her pastors, she could not sleep, and it affected her eating habits.

{¶21} On February 26, 2023, Defendant again came into the church. T.R. had been on her way, but when she learned of his presence she decided to go back home. Her stepmother was there that day and saw him. She knew he was no longer allowed to be there and called Pastor Brown. Pastor Brown instructed her to call the police.

{¶22} An officer with the Canton Police Department, Josh Tanner, and his partner arrived at the church. At this point, Defendant had gone outside and was sitting in his car in the parking lot. Defendant told the officers he was there to attend service, but the doors were locked. The officer observed that the doors were clearly not locked and that it looked as if the service was going to begin soon.

{¶23} While his partner stayed in the parking lot with Defendant, Officer Tanner went inside and spoke with T.R.'s stepmother and Pastor Brown. From those

conversations, it was the officer's understanding that Defendant had trespassed on church property, and Defendant was arrested.

{¶24} The trial court initially found that Defendant was incompetent to stand trial, but restorable. After treatment, the parties stipulated to an expert's report that found his competency had been restored. The case went to trial on December 11, 2023. The jury heard testimony from T.R., Pastor Brown, T.R.'s stepmother, Officer Josh Tanner, and Defendant.

{¶25} During his testimony, Defendant stated that Tramel was his government name and that he went by the name "God." He also described an encounter he claimed to have had with God at a bus stop years before meeting T.R., at which time he met God who transferred his energy to Defendant. Defendant stated that he began to have feelings for T.R. when they met at work. When he asked her if she was seeing anyone and she responded "I'm God's girl." Defendant interpreted that to mean she "was my girl" because "I'm God."

{¶26} When asked about the video, Defendant denied that he intended to harm T.R. He admitted that he did not have her phone number and did not know where she lived. The only way he could have contact with her was at church. He stated that it didn't matter that he was told not to go to the church anymore because he was God. He stated that it did not matter that T.R. told him she did not want a relationship with him because "she told Tramel Sheppard that," not God.

{¶27} The jury found Defendant guilty of menacing by stalking and criminal trespass. On December 13, 2023, the trial court entered a Judgment Entry and sentenced Defendant to a community control sanction. It is from this entry that he now appeals.

**ASSIGNMENTS OF ERROR**

I.

{¶28} THE STATE FAILED TO PRESENT SUFFICIENT EVIDENCE TO SUSTAIN A CONVICTION AGAINST APPELLANT, AND THE CONVICTIONS MUST BE REVERSED.

II.

{¶29} THE APPELLANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AND MUST BE REVERSED.

**ANALYSIS**

I.

{¶30} In his first assignment of error, Defendant has argued that the State did not present sufficient evidence of menacing by stalking and criminal trespass to sustain his convictions. The standard of review for a challenge to the sufficiency of the evidence is set forth in *State v. Jenks*, 61 Ohio St.3d 259 (1991) at paragraph two of the syllabus. *State v. Taylor*, 2023-Ohio-4160, ¶ 54 (5th Dist.).

{¶31} In *Jenks*, the Ohio Supreme Court held "[a]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *Jenks*, at paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶32} In *State v. Thompkins,* 78 Ohio St.3d 380, 386–87 (1997), the Ohio Supreme Court stated "'sufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." Citing *Black's Law Dictionary* (6th Ed. 1990). See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). It is, in essence, a test of adequacy. *Id.* Whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.,* citing *State v. Robinson*, 162 Ohio St. 486 (1955).

### Menacing by Stalking

{¶33} Defendant was convicted of Menacing by Stalking, R.C. 2903.211(A)(1). The statute provides, in pertinent part, that "no person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person . . . or cause mental distress to the other person . . . ." It is a felony of the fourth degree if the offender has a history of violence toward the victim or any other person. R.C. 2903.211(B)(2)(e). The parties stipulated to a prior conviction for felonious assault and aggravated robbery in the case of *State v. Sheppard,* Summit C.P. No. CR 2010 01 0159.

{¶34} In this case, Defendant has argued that the State failed to present sufficient evidence that he engaged in a pattern of conduct that knowingly caused T.R. to believe that he would cause her physical harm or mental distress. He has claimed that there was no evidence presented at trial that he "ever made any threats to T.R." He has also claimed that other than two incidents, his conduct in church occurred when T.R. was not present and that his Facebook posts were not made directly to her.

{¶35} The statute itself does not require proof of making a threat to the victim, although a threat of physical harm to the victim would elevate the offense from a first-degree misdemeanor to a fourth-degree felony. R.C. 2903.211(A)(1), 2903.211(B)(2)(b). It requires evidence of a pattern of behavior that makes another person believe that the offender will cause physical harm or mental distress. A "pattern of conduct" is defined, in pertinent part, as "two or more actions or incidents closely related in time, whether there as been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1).

{¶36} The State produced evidence of incidents that occurred at the workplace and church. Defendant did not dispute the existence or the description of the conduct alleged in the State's case. He disputed that his conduct knowingly caused T.R. to believe he would cause physical harm or mental distress. In supporting his position, he did not address any of the instances from the workplace, but instead focused on what happened at church. He has argued that after he approached T.R. and asked to talk "about us" and after he stopped a service to ask her to marry him, he had no more direct contact with T.R. The time he stopped church to take a crown in the pulpit and the time he took his shirt off in the service happened when T.R. was not in attendance. He similarly argued that the Facebook posts and video were not communicated directly to her. Otherwise, he claimed he "was simply attending church on Sundays."

{¶37} Defendant specifically focused on the Facebook page as the only thing which "arguably could have been perceived as a threat." In support, he cited the case of *State v. Richard,* 129 Ohio App.3d 556 (7th Dist. 1998). In that case, the defendant made the statement "I should just kill her, maybe that will end it all." The appellate court

determined he was "not guilty of menacing because the alleged victim was not the person to whom he addressed his statement." *Id.* at 561.

{¶38} This Court disagreed with *Richard* in *St. v. McWilliams,* 2012-Ohio-663 (5th Dist.). In *McWilliams,* the defendant argued that his conviction for aggravated menacing should have been dismissed because he stated his threat to a third party and not to the person who was the subject of the threat. We held that to sustain an aggravated menacing conviction, a threat to cause the harm need not be made directly to the intended victim, but may be sufficient if made to a third-party to whom the defendant knew or reasonably should have known would convey the threat to the intended victim. *McWilliams* at ¶ 27.

{¶39} Specifically addressing online posts, this Court has determined that public Facebook posts were sufficient to knowingly cause mental distress. *L.L. v. R.B.,* 2017-Ohio-7553, ¶ 27 (5th Dist.). Another appellate court has found the posts were sufficient even if the victims did not maintain a Facebook account. *State v. Rowbotham*, 2022-Ohio-926, ¶ 94 (7th Dist.).

{¶40} Although it was unclear from the testimony how T.R. specifically learned of the Facebook posts and video, they were on his public Facebook page and she learned of them within a day or two of their posting. There was testimony that they had a least one friend in common from work and that the members of the church were also familiar with the situation.

{¶41} The two posts continued the theme of wanting a relationship and sex with T.R. despite her clear and continued repudiation of the same. The video was taken on the property of the church, even though Defendant had previously been asked to leave. It showed him walking around the property and using profanity regarding T.R.

{¶42} A person's repeated actions or incidents may create a reasonable belief in another person that they are in danger of physical harm or mental distress. Stalking may require examination of the offender's past conduct involving the victim to assist a jury in understanding the context of what might appear to be an innocent act. *State v. Horsley*, 2006-Ohio-1208, ¶ 26. "'Other acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress.'" *Id.,* quoting *State v. Bilder*, 99 Ohio App.3d 653 (9th Dist. 1994); *State v. Tichon*, 102 Ohio App.3d 758 (9th Dist. 1995). It is important to take everything into consideration "'even if some of the person's actions may not, in isolation, seem particularly threatening.'" *State v. McDermitt*, 2022-Ohio-2422, ¶ 86 (5th Dist.), quoting *State v. Dillard* 2018-Ohio-4842, ¶ 17 (10th Dist.).

{¶43} At trial, the jury heard of numerous actions or incidents spanning from the summer of 2022 to February 2023. At work, Defendant followed her around the workplace and was outside waiting for her when she took her breaks, even after T.R. told him to stop. He continued appearing at her workstation, despite being told to stop by supervisors and human resources. She once awoke to him over top of her rubbing her shoulders. Despite her telling him she did not want a relationship, he asked her out twice and asked her if she wanted to have sex. He continued to pursue her despite her repeatedly telling him no. He was terminated from work for his conduct.

{¶44} At church, defendant tried to talk to her even though she exhibited fear, and a cousin had to intervene. Despite expressly knowing that the two were not in any type of

relationship and knowing of T.R.'s desire not to have any such relationship, Defendant stopped a worship service to ask her to marry him. After similar such behavior such as walking toward the pulpit and claiming a crown was his and he was God, and another where he took his shirt of and began discussing his tattoos, the church was aware that his presence caused T.R. distress and she would be called and told not to attend if he were there. T.R. specifically stopped going to church, including taking her grandmother on Christmas, because she "did not know what he would do."

{¶45} As a court viewing the sufficiency of the evidence, this Court's duty is to view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of menacing by stalking proven beyond a reasonable doubt. The record contains sufficient evidence that Defendant engaged in a pattern of conduct that knowingly caused T.R. to believe that he would cause her physical harm or mental distress.

{¶46} Defendant has argued that his conduct was somehow "evidence of his affection" and that the evidence of mental distress was insufficient. He has claimed that while there was evidence to show stress, this did not rise to the level of mental distress. We disagree.

{¶47} Mental distress is defined as follows:

(a) any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

R.C. 2903.211(D)(2). Testimony that a respondent's conduct caused the person considerable fear can support a finding of mental distress. *L.L.* at ¶ 27. Testimony that a victim felt "nervous," "frightened," "upset," "worried," and "scared" was sufficient to support a finding of mental distress for a restraining order. *Middletown v. Jones,* 2006-Ohio-3465, ¶ 8 (12th Dist.).

{¶48} Further, expert testimony is not required to establish the existence of mental distress of a victim for the purpose of proving an element of menacing by stalking. R.C. 2903.211(C)(2)(b). *McDermitt,* 2022-Ohio-2422, at ¶ 92. A victim's testimony was sufficient to establish mental distress because the jurors could rely on their own experiences to determine whether the victim suffered the requisite mental distress as a result of the defendant's actions. *Tichon,* 102 Ohio App.3d at 763*.*

{¶49} In this case, T.R. testified that she was unable to sleep and that it affected her ability to eat. She stated that she talked to her pastors about what was happening. She was unable to go to her family church and participate in worship at the times that Defendant was there. She further stated that she was upset and scared. She contacted the police regarding his behavior. She was told not to come to church when he was there. In the video, Defendant's statement that T.R. would "die a virgin" made her afraid. She took steps to protect herself, including getting pepper spray and firearms. The record in this case would allow a rational trier of fact to find that T.R. suffered mental distress beyond mere stress, annoyance, or embarrassment.

{¶50} When reviewing this case in the light most favorable to the State, we determine that any rational trier of fact could have found the essential elements of

menacing by stalking proven beyond a reasonable doubt. Accordingly, there was sufficient evidence for the verdict.

**Criminal Trespass**

{¶51} Defendant has also argued that there was insufficient evidence to establish his conviction for criminal trespass. He has maintained that he had privilege to be on the church property and that there was no clear communication from an owner or agent of the property that he could not return. We disagree.

{¶52} Criminal Trespass R.C. 2911.21(A)(3) provides:

No person, without privilege to do so, shall do any of the following:

(3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access.

Defendant has argued that he was privileged to be in the church because it was a public place, giving him a "tacit" invitation to be there. Privilege is defined as "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." R.C. 2901.01(A)(12).

{¶53} In this case, there was ample evidence before the court that the defendant entered church property on February 26, 2023, as a knowing trespasser. The record reveals that the defendant had been informed that his privilege to attend church services had been revoked. Pastor Brown testified regarding the incident when he took his shirt off in the church. She stated he was cussing while showing his tattoos and saying "you don't know what this mean." Pastor Brown testified that she felt threatened by his actions. The men of the church became involved, and Pastor Brown stated she was trying to get

him to calm down and be peaceful. She told him "I don't want to call the police, just stop coming here. And I said it several times." She testified that she ultimately did have to call the police "a couple of times." Despite being told to leave "several times," Defendant kept coming back until the February 26 incident, when he was arrested.

{¶54} There was evidence that he understood that he was not to be at the church. In Defendant's video, he repeatedly said "they kicked me out." At one point saying "they kicked me out, now I'm back." He referenced the time he took his shirt off when he was first asked to leave and stated "they really got offended when I pop top." A rational trier of fact could have found evidence for the essential element that he did not have privilege to enter the church property and that he understood, at a minimum when he posted the video in December, that he was not welcome back.

{¶55} Defendant has argued that *State v. Barksdale,* 2 Ohio St.3d 126 (1983), stands for the proposition that privilege is "tacit" when a premise is open to the public. In that case, the defendant broke into a car on a dealership lot. He was convicted and found guilty of breaking and entering. The Ohio Supreme Court reversed the conviction because the State could not prove the trespass element of breaking and entering. It held that entering property with intent to commit a felonious act does not forfeit the right of entry and make the defendant a trespasser. *Id.* 128-29.

{¶56} Defendant analogizes himself as a "public invitee" to a public religious service. The defendant misreads *Barksdale.* The court in that case held that a business invitee cannot be charged with trespass in areas open to the public without evidence that he entered with knowledge that he was not privileged to do so. *Id.* The Court was concerned that the language of R.C. 2911(A)(3) would create a strict liability crime when

a person entered public property with intent to commit a felonious act and held that trespass required knowledge on the part of the accused that he was entering without privilege. *Id.* Unlike the record in *Barksdale,* the record here is replete with evidence that this Defendant knew that he no longer had privilege to be on church property.

{¶57} Property does not lose its private character merely because the public is generally invited to use it for designated purposes. *Lloyd Corporation v. Tanner,* 407 U.S. 551, 569 (1972). The owner or one in lawful possession has the right to determine whom to invite, the scope of the invitation, and the circumstances under which the invitation may be revoked. *Id.* at 567. *See also, In re C.J.*, 2009-Ohio-5617 (people may have privilege to be at a church or school, but for certain purposes); *City of Akron v. Niepsuj*, 2003-Ohio-6581 (a public university's campus is private property and the university has the authority to revoke an individual's privilege to enter upon its property).

{¶58} Notwithstanding his lack of communication argument, Defendant has also raised that there was no evidence to show a person authorized to revoke his privilege did so. He posed that the congregation did not have the power and that it could have been done only by an owner or agent.

{¶59} The testimony at trial was that the Pastor Brown asked Defendant to leave on multiple occasions, up to and including calling the police to reinforce that demand. A pastor is appointed to lead the congregation in worship services and to provide spiritual counseling. A pastor acts as a representative of a church to both its members and the community. When T.R.'s stepmother testified that she was unsure how to proceed next, she contacted Pastor Brown. Pastor Brown was present that day and spoke to the officers. She was present in her role as Pastor at the incidents that occurred at the church.

While there was no testimony regarding the formal structure and hierarchy of the church, there was sufficient evidence that Pastor Brown was an agent of the church and was authorized to tell Defendant to leave.

{¶60} When reviewing this case in the light most favorable to the State, we determine that any rational trier of fact could have found the essential elements of the criminal trespass proven beyond a reasonable doubt. Accordingly, there was sufficient evidence for the jury to make its determination on Criminal Trespass.

{¶61} The evidence presented was sufficient to establish that Defendant engaged in a pattern of conduct that would cause T.R. to believe that he would cause physical harm or mental distress. Similarly, the evidence presented was sufficient to establish that any privilege to be on the property was revoked. Defendant's first assignment of error is without merit.

II.

{¶62} In addition to his argument that there was insufficient evidence, Defendant has also argued that the jury's verdict was against the manifest weight of the evidence. He has argued that the State's witnesses were not credible.

{¶63} The criminal manifest weight of the evidence standard was explained in *Thompkins*, 78 Ohio St.3d 380. The Court distinguished between "sufficiency of the evidence" and "manifest weight of the evidence," finding that these concepts differ both qualitatively and quantitatively. *Id.* at 386. Unlike sufficiency of the evidence which asks whether the evidence is legally sufficient to support a verdict as a matter of law, weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-87. A reviewing

court asks whether the state or the defendant's evidence is more persuasive. *State v. Wilson*, 2007-Ohio-2202, ¶ 25.

{¶64} Although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Thompkins* at 387. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

{¶65} To evaluate a manifest weight claim, a court must review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *State v. McKelton*, 2016-Ohio-5735, ¶ 328. The court must decide whether the jury clearly lost its way in resolving conflicts in the evidence and "'created such a manifest miscarriage of justice that the conviction must be reversed.'" *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶66} The reviewing court must bear in mind, however, that credibility generally is an issue for the trier of fact to resolve. *State v. Issa,* 93 Ohio St.3d 49, 67 (2001); *State v. Murphy,* 2008-Ohio-1744, ¶ 31 (4th Dist.). "Because the trier of fact sees and hears the witnesses and is particularly competent to decide 'whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." *Barberton v. Jenney,* 2010-Ohio-2420, ¶ 20 (Citations omitted.) Thus, an appellate court will leave the issues of weight and credibility of the evidence to the factfinder, as long as a rational basis exists in the record for its decision. *State v. Picklesimer*, 2012-Ohio-1282, ¶ 24 (4th Dist.); *accord State v. Howard,* 2007-

Ohio-6331, ¶ 6 (4th Dist.) ("We will not intercede as long as the trier of fact has some factual and rational basis for its determination of credibility and weight.").

{¶67} In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts on the same level as the jury and reviews the entire record. *Thompkins* at 387. It then "weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶68} Defendant has argued that Pastor Brown's testimony was not credible because she stated that Defendant began coming to church in 2023 but discussed incidents that occurred in 2022. She also testified that she did not know the Defendant, but then testified about incidents in which "she had a personal interaction" with him.

{¶69} Review of the testimony, however, reveals that it was competent and credible evidence from which the jury could make its determination. Pastor Brown refenced the "beginning of '23" but then stated "somewhere in there" and "I don't know exactly." The events she described were consistent with other testimony and the record. It was also consistent with her testimony that nothing unusual had happened when Defendant first came to the church, but that his behavior escalated up until the final incident in February 2023. Pastor Brown identified her knowledge of Defendant as "I don't know him, but I know of him." She stated she met him through him "coming to the church." As T.R. and Defendant did not have a relationship, Pastor Brown would have known him

only through the church. There is nothing about her testimony that would cause the jury to lose its way.

{¶70} Next Defendant has argued that T.R.'s testimony was contradictory because she testified she only saw Appellant at work, but she invited him to her church and rode home with him from work on one occasion. There is nothing inconsistent about this testimony. She explained that they met working together and that on one occasion he gave her a ride home. During that ride, he explained a situation that had happened at his church and in an attempt to share her faith she invited him to attend her church.

{¶71} Finally, Defendant argued that T.R.'s stepmother's testimony contradicted Officer Tanner's testimony. The specific testimony was as follows:

Q. When you called the police on February 26, did you tell the police that Tramel was at the church at that time harassing you daughter?

A. I told him - - I told him that he was at the church and he was not allowed to be at the church."

Q. Okay. But that's, that's all you told them?

A. That's all I said.

In addition, she stated she did not call T.R. and tell her not to come to church that day.

{¶72} Officer Tanner testified that he went into the church to speak with "our caller" and she informed him that Defendant had been "stalking and harassing her daughter." T.R.'s stepmother's testimony was that she called the police when Defendant arrived per Pastor Brown's instruction because he was not allowed to be there. Whether she did not remember giving the police officer the specific background information does not affect her credibility Defendant was present at the church.

{¶73} In resolving Defendant's manifest weight claim, this Court has reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of witnesses. The jury did not lose its way in resolving the conflicts in the evidence. It did not create such a manifest miscarriage of justice that the conviction must be reversed. The second assignment of error is without merit.

## CONCLUSION

{¶74} The judgment of the Stark County Court of Common Pleas is affirmed.

By: Delaney, P.J.,

Hoffman, J. and

King, J., concur.