[Cite as *State v. Stevens*, 2025-Ohio-5123.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| STATE OF OHIO | Case No. 25 CAA 03 0024 |
| Plaintiff - Appellee | <u>Opinion and Judgment Entry</u> |
| -vs- | Appeal from the Delaware County Court of Common Pleas, Case No. 23 CRI 08 0411 |
| JAMES STEVENS | Judgment: Affirmed |
| Defendant – Appellant | Date of Judgment Entry: November 12, 2025 |

**BEFORE:** Craig R. Baldwin, William B. Hoffman, Robert G. Montgomery, Appellate Judges

**APPEARANCES:** Melissa A. Schiffel, Delaware County Prosecuting Attorney, Katheryn L. Munger Assistant Prosecuting Attorney, for Plaintiff-Appellee; Russell S. Bensing, for Defendant-Appellant

OPINION

*Hoffman, J.*

{¶1}  Defendant-appellant James T. Stevens appeals his conviction and sentence entered by the Delaware County Court of Common Pleas, on one count of gross sexual imposition, following a jury trial.  Plaintiff-appellee is the State of Ohio.

STATEMENT OF THE CASE AND FACTS

{¶2}  On September 14, 2023, the Delaware County Grand Jury indicted Appellant on one count of rape, in violation of R.C. 2907.02((A)(2) and (B), a felony of the first degree (Count I); one count of sexual battery, in violation of R.C. 2907.03(A)(5) and (B), a felony of the third degree (Count II); and one count of gross sexual imposition, in violation of R.C. 2907.05(A)(1) and (C)(1), a felony of the fourth degree (Count III).  Appellant appeared for arraignment on December 1, 2023, and entered a plea of not guilty to the charges.  Appellant executed a written waiver of his right to a speedy trial.

{¶3}  After several continuances, the matter proceeded to jury trial on January 28, 2025.  The following evidence was presented at trial:

{¶4}  Victim, who was 15 years old at the time of trial, testified Appellant and his wife adopted her when she was 6 or 7 years old. Victim had three (3) half-siblings who were also adopted by Appellant and his wife.  The family lived in Ohio then moved to Florida. The family's Florida home had an in-ground pool.  Victim recalled a time when she was in the pool with Appellant and Appellant asked her "how much money it would have taken for [her] to take off the dress that [she] was wearing that day." Trial Transcript, Vol. II at p. 240.  Victim got out of the pool, dried off, and told her mother what happened. Victim, her mother, and Appellant "had a lot of conversations about it," but "didn't really

move forward much, and [Victim] went to therapy." *Id*. Appellant denied making the comment. Victim admitted she told her therapist the dress story was untrue. When asked why she told her therapist the story was untrue, Victim explained she did so "[b]ecause I felt like no one believed me." *Id*. at p. 242. Victim stated the statements Appellant made were, in fact, true.

{¶5} Victim recalled, after Appellant and her mother divorced, the family returned to Ohio. Appellant and her mother had separate residences. Victim and her siblings rotated a week on/week off with Appellant and her mother. When Victim stayed with Appellant, he would come into her room during the night, lay down next to her, and talk. Appellant repeated this behavior, but eventually began taking off Victim's pajamas and touching her. Victim revealed Appellant digitally penetrated her, performed cunnilingus on her, and kissed her breasts. Victim admitted she never disclosed what Appellant was doing, but explained she did not think anyone would believe her. During a family meeting with her therapist, Victim indicated she wanted to live full-time with her mother. She also stated she was not comfortable with the amount of Appellant's physical touch.

{¶6} On July 25, 2023, Victim met with the youth minister from Life Point Church and revealed Appellant was inappropriately touching her. That evening, Victim cut her wrists and was taken to the emergency room. Victim stated she subsequently underwent a full physical at Nationwide Children's Hospital.

{¶7} S.R., Appellant's ex-wife and Victim's mother, testified she and Appellant were married for fifteen (15) years and had six (6) children together, two (2) of the children were Appellant's biological children from a previous marriage and the other four (4) were adopted. S.R. noted the adoption of Victim and her half-siblings was finalized in 2015.

The family was living in Westerville, Ohio, at the time, but eventually moved to the Tampa, Florida area.

{¶8}   S.R. recalled the family took a vacation to St. Augustine, Florida.  To accommodate the family, S.R. booked a two-bedroom suite with a living room at the hotel. While the rest of the family was in the living room watching a movie, Victim went into one of the bedrooms to watch another movie.  Appellant followed Victim into the bedroom a short time later.  After 20 minutes, S.R. proceeded to the bedroom to advise Appellant and Victim the rest of the family was ready to go out. When she walked in, Victim was sitting on the bed with her legs straight out.  Appellant was sitting in a chair next to the bed, rubbing Victim's thigh between the bottom of her shorts and her knees.  S.R. subsequently had a discussion with Appellant, expressing her discomfort with what she observed.

{¶9}   One evening, Victim came into living room after she had been outside swimming.  Victim approached S.R., who noticed Victim seemed upset.  Victim told S.R. Appellant asked her how much money would it take for her to take off her dress.  S.R. was confused as Victim was in a swimsuit at the time.  Victim shared she had worn a dress that day.  When S.R. asked Victim if anything else occurred, if Appellant had said or physically done anything else, Victim responded, "No."   When Victim's brother came into the house, S.R. asked if anything happened between Victim and Appellant.  Victim's brother thought she might be upset because Appellant was playing with him in the pool rather than the Victim.  When S.R. confronted Appellant with what Victim told her, Appellant denied making the comment.  S.R. and Appellant implemented a safety plan to

ensure Appellant would not be alone with Victim. According to S.R., Appellant did not abide by the plan.

{¶10} S.R. and Appellant divorced in March, 2023. They entered into a joint custody agreement with a week on/week off schedule. Appellant returned to Ohio shortly after the divorce. S.R. and the children remained in Florida until their house sold, returning to Ohio in May, 2023. On July 25, 2023, S.R. was contacted by someone from the church the children attended. Based on the conversation, S.R. asked the caller to contact Children's Protective Services ("CPS") and provide the agency with the details the caller had provided to her. S.R. contacted the police. That evening, Victim was taken to the emergency department at Nationwide Children's Hospital after she cut her wrists. S.R. subsequently took Victim to the Child Assessment Center at Nationwide Children's Hospital.

{¶11} On August 1, 2023, S.R. phoned Appellant while she was at the Child Assessment Center. S.R. was in a small room with a detective and the call was recorded. The call was played for the jury. During the conversation, Appellant admitted to S.R. he went into Victim's room in the middle of the night, "maybe twice to talk to her." Appellant commented it was "verifiable" he touched Victim's leg. Appellant questioned why the police took Victim's clothes because if he had done what was alleged, he would have taken off her clothes.

{¶12} Alison Humphreys, a medical forensic interviewer in the Center for Family Safety and Healing at Nationwide Children's Hospital, described the forensic interview process. The child is initially seen by a nurse, who takes the child's vitals. Before conducting the forensic interview, the forensic interviewer meets with the caregiver to

discuss the process and collect background information. The interview is conducted with only the interviewer and the child. To avoid having a child traumatized by repeated questioning, the multi-disciplinary team watches the interview in a separate room. Each interview is recorded. The forensic interviewer will confer with the multi-disciplinary team to ensure she has thoroughly covered all matters. The forensic interviewer provides the doctor with the pertinent history and the child's disclosures. The child is then examined by a doctor. The purpose of a forensic interview is to gather information from the child in a trauma informed way for medical diagnosis and treatment.

{¶13} Humphreys testified she conducted a forensic interview with Victim on August 1, 2023. During the interview, Victim disclosed Appellant performed cunnilingus on her and touched her breasts with his hands. On cross-examination, Humphreys acknowledged trauma can affect the development of a child's brain, including the prefrontal cortex which governs lie telling. Humphreys also agreed repeated interviews could have negative suggestive influences. On redirect, Humphreys explained, despite the fact trauma can impact brain development, an individual who has suffered trauma is not compelled to lie. Humphreys reiterated she tries to control suggestibility during her interviews by asking for sensory details.

{¶14} Dr. Nara Cho with the Center for Family Safety and Healing at Nationwide Children's Hospital testified she performed a comprehensive physical examination of Victim. Before doing so, Dr. Cho consulted with Humphreys as well as a mental health advocate. Dr. Cho stated a sexual assault exam kit was not performed because Victim presented outside the time frame for forensic evidence collection. Dr. Cho performed an anogenital examination. Dr. Cho did not observe any injury to Victim's vagina, but noted

the tissue of the vagina and hymen heals quickly so the fact there was no observable injury was not surprising.

{¶15} Following Dr. Cho's testimony, the State rested its case. Counsel for Appellant made an oral Crim.R. 29 motion for acquittal with respect to the rape and sexual battery charges, which the trial court denied.

{¶16} Appellant called Dr. Kamala London, a professor at the University of Toledo, as his sole witness. Dr. London has spent the majority of her career researching developmental psychology, specifically, children's development and how such can inform best practices in conducting forensic interviews with children. Dr. London has testified as an expert in the areas of child and adolescent suggestibility, including indirect suggestive influences; intentional deception by children and adolescents, including evaluation of motives to lie; disclosure of sexual abuse and how it occurs; and forensic interviewing techniques.

{¶17} Counsel for Appellant presented Dr. London with a hypothetical involving the facts underlying Victim's allegations and the family's response thereto. Dr. London found the safety plan S.R. and Appellant implemented following Victim's disclosure Appellant asked her how much money would it take for her to take off her dress was "quite a powerful form of suggestion." Trial Transcript, Vol. III at p. 397. Dr. London testified a child's recantation then subsequent recanting of the recantation implies a form of suggestibility which should be explored by an interviewer. Dr. London added recantation is "not the typical way that valid, you know, abuse cases present." *Id*. at p. 400.

{¶18} Dr. London discussed deception, which she noted was a normal part of cognitive development. Dr. London explained "early childhood trauma has been found to

affect children's emotional and cognitive and brain development." *Id*. at p. 403. Dr. London added, "children who experience early childhood trauma have been found to have deficits in those areas of impulse control, the prefrontal cortical cognitive processes, emotional regulation, and so forth." *Id*. In addition, Dr. London testified:

> Studies have found that children who have experienced early traumatic – you know, early traumatic experiences tend to lie more during adolescence, given the issues with emotional regulation and impulse control or even just experiences with, you know, a chaotic environment. There are a number of studies that found behavioral problems, including lying, to be more common among children who experienced early traumatic events.
>
> *Id*.

{¶19} On cross-examination, Dr. London acknowledged a child who has experienced trauma is also more susceptible to victimization. Dr. London agreed an individual may recant a disclosure based upon different motives, including pressure from other people. Dr. London reiterated it was best practice for an interviewer to ask non-suggestive, open-ended questions and remain neutral.

{¶20} After hearing all the evidence and deliberating, the jury found Appellant not guilty of rape (Count I) and sexual battery (Count II), but guilty of gross sexual imposition (Count III). On February 3, 2025, the trial court filed a judgment entry reflecting the jury's verdict. Appellant appeared before the trial court for sentencing on February 28, 2025.

The trial court imposed a four-year term of community control and classified Appellant as a Tier I sex offender. The trial court memorialized Appellant's sentence via Judgment Entry of Sentence of Community Control filed February 28, 2025.

{¶21} It is from his conviction and sentence Appellant appeals, raising the following assignment of error:

THE TRIAL COURT ERRED IN ENTERING A CONVICTION OF MURDER [SIC] WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE, IN DEROGATION OF DEFENDANT'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

I

{¶22} In his sole assignment of error, Appellant challenges his conviction as against the manifest weight of the evidence.

*Standard of Review*

{¶23} The term "manifest weight of the evidence" relates to persuasion. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 19. It concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." (Emphasis deleted.) *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), *superseded by constitutional amendment on other grounds as stated in State v. Smith,* 80 Ohio St.3d 89, 102 n.4 (1997); *State v. Martin*, 2022-Ohio-4175, ¶ 26.

**{¶24}** In determining whether a judgment is against the manifest weight of the evidence, an appellate court reviews the entire record, " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). Sitting as the "thirteenth juror," the court of appeals considers whether the evidence should be believed and may overturn a verdict if it disagrees with the trier of fact's conclusion. *See id.*

**{¶25}** When conducting a manifest weight review, the question is whether the jury clearly lost its way in resolving conflicts, resulting in a manifest miscarriage of justice, even if the evidence is legally sufficient. *Thompkins*, 78 Ohio St.3d at 387; *State v. Issa*, 93 Ohio St.3d 49, 67 (2001). Appellate courts have traditionally presumed the jury's assessment is correct, given its ability to observe witnesses' demeanor, gestures, and tone, all critical factors in evaluating credibility. *Eastley*, 2012-Ohio-2179, at ¶ 21; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

**{¶26}** A manifest-weight claim succeeds only in "the exceptional case in which the evidence weighs heavily against the conviction." (Internal quotations omitted.) *Thompkins*, 78 Ohio St.3d at 387. To reverse a conviction on manifest-weight grounds, all three judges on the appellate panel must concur. Ohio Const., Art. IV, § 3(B)(3); *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶¶ 2-4, citing *Thompkins*, syllabus ¶ 4.

*Analysis*

**{¶27}** Appellant was convicted of gross sexual imposition, in violation of R.C. 2907.05(A)(1):

(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

(1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

R.C. 2907.05(A)(1).

**{¶28}** Appellant contends his conviction was against the manifest weight of the evidence due to Victim's lack of credibility and the forensic interviewer's failure to explore whether Victim was intentionally deceptive or had a motive to deceive. Appellant relies on the testimony of his expert witness, Dr. Kamala London, in support of his contentions.

**{¶29}** Dr. London testified the safety plan S.R. and Appellant implemented following Victim's disclosure of the dress incident was "quite a powerful form of suggestion." Tr., Vol. III at p. 397. Dr. London added a child's recantation then subsequent recanting of the recantation implies a form of suggestibility which should be explored by an interviewer. However, Dr. London did not opine whether any of the Victim's disclosures were actually the result of suggestion. In addition, Dr. London

discussed studies which have revealed children who experienced early trauma tended to lie more during adolescence.

**{¶30}** On cross-examination, Dr. London acknowledged a child who has experienced trauma is also more susceptible to victimization. Dr. London also agreed an individual may recant a disclosure based upon different motives, including pressure from outside people. The doctor's testimony focused primarily on best practices in the interview process. Her testimony provided generalizations, not specifics relative to Victim herein.

**{¶31}** Victim testified, after Appellant and her mother divorced, she and her siblings rotated a week on/week off with each parent. When Victim stayed with Appellant, he would come into her room during the night, lay down next to her, and talk. Appellant repeated this behavior, but eventually began taking off Victim's pajamas and touching her. Victim revealed Appellant digitally penetrated her, performed cunnilingus on her, and kissed her breasts. Forensic interviewer Alison Humphreys testified Victim disclosed Appellant's "mouth touched her vagina; that his tongue went inside of her vagina; and that his hands touched her breasts." Tr., Vol. II, p. 330. During a recorded call with S.R., Appellant admitted he entered Victim's room in the middle of the night and he touched her leg.

**{¶32}** "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *State v. Butler*, 2024-Ohio-4651, ¶ 75 (5th Dist.). " 'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing

the credibility of the proffered testimony.' " (Bracketed text in original.) *State v. Williams*, 2024-Ohio-5578, ¶ 61 (5th Dist.), quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). "[A]n appellate court will leave the issues of weight and credibility of the evidence to the factfinder, as long as a rational basis exists in the record for its decision." *State v. Sheppard*, 2025-Ohio-161, ¶ 66 (5th Dist.).

{¶33} Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, we find the jury's verdict is not against the manifest weight of the evidence.

{¶34} Appellant's sole assignment of error is overruled.

{¶35} The judgment of the Delaware County Court of Common Pleas is affirmed. Costs assessed to Appellant.

By: Hoffman, J.

Baldwin, P.J. and

Montgomery, J. concur