[Cite as *In re A.G.*, 2025-Ohio-1228.]

COURT OF APPEALS
MUSKINGUM COUNTY, OHIO
FIFTH APPELLATE DISTRICT

IN THE MATTER OF:

|                 |   |                              |
|-----------------|---|------------------------------|
| A.G.            | : | JUDGES:                      |
| K.C.            | : | Hon. Craig R. Baldwin, P.J.  |
| A.C.            | : | Hon. Robert G. Montgomery, J.|
| Z.G.            | : | Hon. David M. Gormley, J.    |
| I.G.            | : |                              |
| A.G.            | : | Case Nos.                    |
| C.G.            | : | CT2024-0103                  |
|                 | : | CT2024-0104                  |
|                 | : | CT2024-0105                  |
|                 | : | CT2024-0106                  |
|                 | : | CT2024-0107                  |
|                 | : | CT2024-0108                  |
|                 | : | CT2024-0109                  |
|                 | : |                              |
|                 | : | O P I N I O N                |

CHARACTER OF PROCEEDING: Appeal from the Muskingum County Court of Common Pleas, Juvenile Division, Case Nos. 22430060, 22430061, 22430062, 22430063, 22430064, 22430065, 22430066

JUDGMENT: Affirmed

DATE OF JUDGMENT: April 3, 2025

APPEARANCES:

For Appellee - Muskingum County Adult and Child Protective Services

For Appellant - Mother

Kallen M. Haddox
Assistant Prosecuting Attorney
27 North Fifth St., P.O. Box 189
Zanesville, Ohio 43702

Evan N. Wagner
100 E. Campus View Blvd.
Suite No. 250
Columbus, Ohio 43235

*Gormley, J.*

**{¶1}** Appellant mother challenges the judgment of the Muskingum County Juvenile Court awarding temporary custody of her seven children, A.G. (D.O.B.: 02/02/10), K.C., A.C., Z.G., I.G., A.G. (D.O.B.: 06/10/20), and C.G., to Muskingum County Adult and Child Protective Services (the "Agency"). She contends that the trial court's judgment was unsupported by the evidence and contrary to law. We see no flaws in the trial court's analysis and now affirm.

## The Basic Facts

**{¶2}** Mother's seven children range in age from 1 year old to 15 years old. A.G. (D.O.B.: 02/02/10) is the eldest. K.C. was born in January 2011 and is currently 14 years old. A.C. was born in February 2012 and is now 13 years old. Z.G. was born in April 2014 and is 10 years old. I.G. was born in June 2018 and is currently 6 years old. A.G. (D.O.B.: 06/10/20) is now 4 years old. C.G. was born in November 2023 and is currently 17 months old.

**{¶3}** Antonio Smith is the father of the elder A.G. Antonio Canada is the father of K.C., A.C., Z.G., and the younger A.G. James Williams is the father of I.G. The father of C.G. is currently unknown. Prior to the Agency's involvement, none of the fathers lived with mother or the children.

**{¶4}** In December 2023, the Agency received a report alleging that mother was unable to care for her children. That report, filed by the elder A.G., claimed that she and the other children were suffering from untreated illnesses and malnutrition, that mother was abusing drugs and alcohol, and that mother was leaving the children alone and unsupervised for extended periods of time.

**{¶5}** As part of her investigation of that report, a caseworker who worked for the Agency visited the house where mother and her children lived. That caseworker did not find any evidence of malnutrition, noting that mother received public assistance and that the home had plenty of up-to-date groceries. The caseworker spoke with the other children, and none of them mentioned the concerns that the eldest sibling had reported. Mother agreed to a drug test for the Agency, and that test showed no evidence of recent drug or alcohol usage.

**{¶6}** The Agency did, however, find that several of mother's children had significant behavioral issues. Mother's two oldest children — the elder A.G. and K.C. — had been arrested and brought before a magistrate in Muskingum County for juvenile-delinquency proceedings earlier that year. That magistrate expressed great concern with mother's ability to control her children.

**{¶7}** In light of these concerns, the Agency held what it described as a "family team meeting" with mother. The Agency emphasized at that meeting that its primary concerns were that: (1) the two oldest children had significant involvement with the juvenile court for delinquency issues, and (2) all of the school-age children had severe behavioral issues at school. At the meeting, mother agreed to participate in a voluntary case plan that was intended to alleviate the Agency's concerns. Mother's objectives under that case plan were to: (1) follow through with services for substance abuse and mental health, (2) follow through with her children's service providers and medical appointments, and (3) resolve her children's behavioral issues. Mother was told that failure to complete her voluntary case plan could result in a formal complaint being filed

by the Agency. Case plans were also drafted for the fathers, though none of them attended the meeting.

**{¶8}** Mother was referred to multiple mental-health and substance-abuse facilities, but staff members at those facilities were unable to contact her, and she did not successfully complete any programs. Mother's children also continued to have significant behavioral issues at home and at school.

**{¶9}** In April 2024 — approximately four months after the starting date for mother's participation in the voluntary case plan — the Agency received a second report about mother's children. That report claimed that mother was refusing to feed her children, was leaving them unattended for days at a time, and was physically abusing Z.G. and the elder A.G. with a wooden dowel rod.

**{¶10}** Two caseworkers from the Agency visited mother's children at school to investigate the report. At school, Z.G. spoke with the caseworkers and corroborated the information in the report. The caseworkers did not, however, see any physical signs of abuse.

**{¶11}** The caseworkers, needing more information, then followed up on the report by visiting mother at her home. Mother allowed the caseworkers to search her vehicle for the dowel rod, but she refused to allow them to search her home.

**{¶12}** Because of mother's refusal to cooperate with the caseworkers and because of her lack of progress on her voluntary case plan, the Agency filed a complaint in the Muskingum County Juvenile Court to have all seven children adjudicated dependent. A brief emergency hearing was held the following day, and the court granted temporary custody of the children to the Agency until a full hearing could occur.

**{¶13}** That full hearing took place in July 2024, and the juvenile court found that all seven children were "dependent children" as that term is defined in Ohio law. The trial court then concluded that all seven children should remain in the temporary custody of the Agency until mother could improve her situation. Mother now appeals.

**The Standard of Review**

**{¶14}** Under Ohio law, "dependent children" are children "[w]hose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]" R.C. 2151.04(C). "A finding pursuant to R.C. 2151.04(C) does not require parental or custodial fault." *In re L.L.*, 2023-Ohio-3032, ¶ 18 (5th Dist.). Rather, the inquiry "must be grounded on whether the children are receiving proper care and support; the focus is on the condition of the children." *In re A.B.C.*, 2011-Ohio-6570, ¶ 15 (5th Dist.), citing *In re Bibb*, 70 Ohio App.2d 117, 120 (1st Dist. 1980). A parent's conduct "is relevant only insofar as it forms a part of the child's environment and it is significant only if it has a detrimental impact" on that child. *In re L.L.* at ¶ 18.

**{¶15}** "Generally speaking, courts apply R.C. 2151.04(C) broadly to protect the health, safety, and welfare of children." *Id.* at ¶ 19. Although courts must look at a child's current condition, "'the law does not require the court to experiment with the child's welfare to see if * * * [the child] will suffer great detriment or harm.'" (Bracketed text in original.) *In re A.B.C.* at ¶ 27, quoting *In re Burchfield*, 51 Ohio App.3d 148, 156 (4th Dist. 1988). "'* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [p]arent an opportunity to prove her suitability.'" (Bracketed text in original.) *In re Chestnut Children*, 2006-Ohio-684, ¶ 27 (5th Dist.), quoting *In re Lilley*, 2004-Ohio-6156, ¶ 34 (4th Dist.).

**{¶16}** The burden is on the state to prove that a child is dependent by clear and convincing evidence. *In re L.L.* at ¶ 20. Clear and convincing evidence is evidence that "'will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Matter of K.H.*, 2025-Ohio-21, ¶ 26 (5th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

## The Juvenile Court's Dependency Finding Was Supported by Sufficient Evidence

**{¶17}** In her first assignment of error, mother argues that the state failed to produce evidence that was sufficient for the trial court to conclude that all seven of her children are dependent.

**{¶18}** A "'review for sufficiency asks whether some evidence exists on each element. It is a test of adequacy, and whether the evidence is sufficient to sustain the judgment is a question of law.'" *In re M.S.*, 2023-Ohio-431, ¶ 17 (1st Dist.), quoting *In re A.B.*, 2015-Ohio-3247, ¶ 15 (1st Dist.). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when 'the evidence is legally sufficient to support the [court's judgment] as a matter of law.'" *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶19}** The state introduced sufficient evidence to support the trial court's dependency judgment for mother's school-age children. The state introduced evidence

that focused on these children's severe behavioral issues when under mother's care as well as their improving condition while in the Agency's custody.

{¶20} A.G. (D.O.B.: 02/02/10) — while in eighth grade — was asked by school officials to withdraw from school or face expulsion because of an alleged sexual-imposition incident. In addition, in October 2023, she burglarized the home of a neighbor, spent time in a juvenile-detention center after being arrested, and was placed on juvenile probation for her felony-level offense. The elder A.G. was reported by mother to be enrolled in an online school after the child's withdrawal from the public school, but mother was unable to confirm this, and the elder A.G. was, as a result, required to repeat much of her eight-grade education while in the Agency's custody.

{¶21} At the time of the dependency hearing, the elder A.G. had been placed at the Julia Paige Family Center in Guernsey County, where she was attending classes and receiving services for her mental-health and physical-health needs. She was reported to be making slow but positive progress at that placement.

{¶22} K.C., like his older sister, burglarized the home of a neighbor, spent time in a juvenile-detention center after being arrested, and was placed on felony-level juvenile probation. K.C., in addition, had a prior juvenile-delinquency adjudication on an assault charge and was required to wear an ankle monitor. K.C. was also suspended from school for an entire year for stealing another student's belongings. Between March 2023 and March 2024, prior to his school suspension, he accrued 7 unexcused absences and 13 excused absences and was involved in 15 disciplinary incidents.

{¶23} K.C. was placed at the Avondale Youth Center in Muskingum County, where he participated in individual and group-therapy services. He was reported at the

time of the July 2024 hearing in the trial court to be maintaining his placement there and slowly but positively completing his program.

**{¶24}** A.C. was placed on non-felony juvenile probation after she was arrested at school for engaging in unruly behavior. Between October 2023 and February 2024, she accrued 15 unexcused absences and 11 excused absences and was involved in 16 disciplinary incidents.

**{¶25}** A.C., like her older brother K.C., was also placed at the Avondale Youth Center. Avondale is a highly-structured foster-care environment, and she was placed there because she had been removed, due to behavioral outbursts, from her placements at three other less-restrictive environments. While at Avondale, she was arrested on three occasions and sent to a juvenile-detention center for violating her juvenile probation. Staff at Avondale observed that she was manipulative and disrespectful to her peers, and that she did not listen to figures of authority. Despite this, she was reported, in July 2024, to be slowly completing her program. Avondale staff members observed that, after settling into her placement, A.C. was starting to form bonds with her peers and was making an effort to correct her behaviors.

**{¶26}** Ten-year-old Z.G. accrued 14 unexcused absences and 4 excused absences and was involved in 8 disciplinary incidents between March 2023 and March 2024. Some of those disciplinary incidents included looking at pornography on school computers and stealing the belongings of teachers and other students.

**{¶27}** Z.G. was placed in a foster home and was reported to be struggling with respecting appropriate boundaries, following directions, and refraining from the destruction of property. She was also observed stealing from, lying to, and manipulating

her peers at that foster home. Staff at that placement sought treatment for Z.G.'s poor vision and scheduled a mental-health evaluation for a possible attention-deficit disorder. At the time of the dependency hearing, Z.G. was described in witness testimony as the child making the slowest progress.

{¶28} I.G. was reported to be "getting in trouble at school." Prior to being taken into the Agency's custody, I.G. was attending school for only half of each day because of his behavior. I.G. also ran away from his home on multiple occasions, once being found by a Zanesville police officer, and once being pulled out of a tree by a Zanesville firefighter.

{¶29} I.G., unlike his older siblings, was placed with his father, James Williams. Williams was the only father who cooperated with the Agency to complete a case plan. Williams ensured that I.G. was taken to each of his medical appointments, including an evaluation for attention-deficit-hyperactivity disorder. Williams completed a parental-education class and had received substance-abuse treatment, though he tested positive for THC — the psychoactive compound in marijuana — five times between March and May 2024. Williams reported that he was employed, and he had successfully maintained a home in Zanesville throughout the Agency's involvement with the family.

{¶30} While under the care of his father, I.G. was enrolled in first grade and had no truancy issues. I.G. was reported to be bonded to Williams and adjusting to his placement well. His behaviors were well-managed and positive, and he had no additional running-away-from-home incidents.

{¶31} After reviewing the evidence introduced at the dependency hearing, we readily conclude that, as it relates to the five school-age children, there was sufficient

evidence to support the trial court's dependency findings. All of these children had severe behavioral issues while they lived under mother's care, and they all experienced improvements while under the Agency's care.

**{¶32}** Whether there was sufficient evidence for the trial court to conclude that the two youngest children were dependent is, however, a closer call. After a careful review of the record, and, mindful of the broad application of R.C. 2151.04(C), we conclude that there was in fact sufficient evidence to support dependency findings for those two children also.

**{¶33}** The condition of mother's five school-age children informs our opinions on the likely development of A.G. (D.O.B.: 06/10/20) and C.G. Mother was unable to control the behavior of her school-age children, and her failure to complete her case plan indicates to us that she would be unable to care for the younger A.G. or for C.G., even with the five older children removed from the home. We note, too, that the younger A.G. and C.G. had health concerns that went unaddressed while those children were under mother's care. The younger A.G. had severe untreated dental complications, and C.G. had an untreated urinary-tract infection.

**{¶34}** The younger A.G. and C.G. received improved care in their placements. The younger A.G. was placed in a non-relative kinship home and was reported to be adjusting very well at that home. She was referred to Nationwide Children's Hospital for dental corrections, where she was anesthetized and had eight impacted teeth extracted. C.G., meanwhile, was placed in a foster home and was also reported at the July 2024 hearing to be meeting her developmental milestones and doing very well. C.G.

underwent medical testing for five days and was taken to an emergency room to receive treatment for her urinary-tract infection.

**{¶35}** No evidence of any behavioral issues on the part of the younger A.G. or C.G. was presented at the July 2024 hearing. Even so, in light of mother's failure to complete her case plan and her inability to control the behavior of her school-age children, the trial court had before it sufficient evidence to conclude that the two preschool children — the younger A.G. and C.G. — would likely continue down the path of their older siblings if temporary custody were not granted to the Agency. Mother's first assignment of error is overruled.

## The Juvenile Court's Dependency Finding Was Not Against the Manifest Weight of the Evidence

**{¶36}** In her second assignment of error, mother contends that the trial court's judgment finding her children to be dependent and awarding temporary custody to the Agency was against the manifest weight of the evidence.

**{¶37}** "In determining whether a [judgment] is against the manifest weight of the evidence, the court of appeals functions as the 'thirteenth juror,' and after 'reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be overturned and a new trial ordered.'" *State v. Hane*, 2025-Ohio-120, ¶ 20 (5th Dist.), quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). The *Thompkins* manifest-weight-of-the-evidence standard applies in civil cases when a manifest-weight-of-the-evidence challenge is raised. *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 17.

**{¶38}** "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *State v. Butler*, 2024-Ohio-4651, ¶ 75 (5th Dist.). "'The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the [trier of fact] is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" (Bracketed text in original.) *State v. Williams*, 2024-Ohio-5578, ¶ 61 (5th Dist.), quoting *Seasons Coal Co., Inc. v. City of Cleveland*, 10 Ohio St.3d 77, 80 (1984). "[A]n appellate court will leave the issues of weight and credibility of the evidence to the factfinder, as long as a rational basis exists in the record for its decision." *State v. Sheppard*, 2025-Ohio-161, ¶ 66 (5th Dist.).

**{¶39}** Mother argues that the trial court incorrectly weighed the evidence surrounding her ability to care for her children. The evidence at the dependency hearing showed that mother was able to provide food and shelter for her children. The first caseworker who visited mother's home found that she was receiving public-assistance benefits, and the home was stocked with plenty of fresh groceries. Mother had also maintained her home in Zanesville throughout the Agency's involvement with the family, and no evidence suggested that any of the children were abused. This favorable evidence, mother argues, outweighed the troubling evidence of her children's behavioral issues.

**{¶40}** The trial court did not, however, create a manifest miscarriage of justice in its weighing of the evidence. Whether a parent can provide adequate food and shelter to a child is only one aspect that a court considers in a dependency case. The focus centers on the best interests of the children. *See* R.C. 2151.04(C). The trial court must consider

more than the provision of the bare necessities for the children because other overarching factors may be present. *See In re D.H.*, 2010-Ohio-2998, ¶ 5 (9th Dist.) (dependency adjudication should concentrate on the needs of the children as well as "environmental elements that are adverse to the normal development of children").

{¶41} The juvenile court, being best positioned to weigh the evidence, concluded here that the children needed more than food and shelter for normal development. The children's home environment had seemingly led to severe behavioral and health issues for them, and mother was unable to address those issues. Mindful of the presumption in favor of the finder of fact, we conclude that the trial court's dependency finding was not against the manifest weight of the evidence. Mother's second assignment of error is overruled.

## The Admission of the Agency's Evidence Did Not Deprive Mother of a Fair Hearing

{¶42} In her third assignment of error, mother argues that her right to a fair hearing was violated when the trial court allowed a caseworker from the Agency to testify about the contents of a case file when that caseworker did not have personal knowledge of some of the information contained in the file.

{¶43} At the dependency hearing, a caseworker from the Agency testified about how the Agency initially became involved with mother and the steps that it took to investigate the condition of her children. Mother's attorney objected to that testimony on hearsay grounds, but the trial judge overruled the objection and allowed the caseworker to testify as to what the Agency's concerns were. The trial judge emphasized that the Agency could offer the testimony to explain "why the agency took the actions that they later took" and not for the truth of the matter asserted.

**{¶44}**  In addition to testifying at the dependency hearing, the caseworker prepared a factual report that was attached to the Agency's initial complaint.  That report was used *by mother's attorney* to cross-examine the caseworker at the adjudication phase of the hearing.   That report contained the same information as the caseworker's earlier objected-to testimony.   The trial judge asked mother's attorney if there was "[a]ny objection to the Court considering and -- and following along with the copy in the Court's file? That way you won't have to admit it as an exhibit."  Mother's attorney replied that he had no objection to the court considering the information in the report.

**{¶45}**  The trial court did not err when it allowed the caseworker to testify about the Agency's concerns or when it admitted the report into evidence.  *See Matter of D.M.*, 2018-Ohio-4737, ¶ 26–27 (5th Dist.) (social workers may testify at custody hearings about the contents of an agency's case file under Evid.R. 803(6) and Evid.R. 803(8)). *See also In re Z.T.*, 2007-Ohio-827, ¶ 21 (8th Dist.) ("social worker's testimony concerning statements made during the course of the agency's investigation" is admissible when "the contents of her file . . . [are] compiled as part of the social worker's activities").  We note, too, that the testifying caseworker became involved in mother's case in January 2024 and did, at that point, develop personal knowledge of the children's behavioral issues and of mother's failure to successfully complete her case plan.

**{¶46}**  Our review of the record finds that the contents of the written report and the caseworker's testimony were properly admitted at the dependency hearing.  Mother's third assignment of error is overruled.

**The Trial Court's Entry Is Not Contrary to Law**

{¶47} In her final assignment of error, mother argues that the trial court's adjudication-and-disposition entry is contrary to law because it allegedly cites inconsistent evidence in support of its conclusions.

{¶48} At the adjudication phase of the dependency hearing, the only witness who testified was the caseworker from the Agency. At the dispositional phase, however, the caseworker and mother testified. In its judgment entry, the trial court made several findings of fact based on mother's testimony. Mother argues that the trial court relied on her testimony from the dispositional phase in reaching its adjudication-phase judgment.

{¶49} The findings of fact that the trial court made based on mother's testimony were: (1) that mother previously lost custody of her children for a three-year period under similar circumstances to those leading to the July 2024 dependency hearing, (2) that psychiatric medication had been prescribed for several of mother's children, and mother had refused to give them that medication, (3) that mother uses medical marijuana to treat her PTSD, and (4) that mother's visits with her children often end poorly.

{¶50} In matters that are tried to the bench — as this dependency hearing was — "[a]n appellate court must presume . . . that the trial court considered nothing but relevant and competent evidence in reaching its verdict." *State v. Brennan*, 2002-Ohio-5952, ¶ 9 (5th Dist.). "[T]his presumption 'may be overcome only by an affirmative showing to the contrary by the appellant.'" *State v. Pearson*, 2015-Ohio-3974, ¶ 13 (10th Dist.), quoting *State v. Wiles*, 59 Ohio St.3d 71, 86 (1991).

{¶51} Mother has not affirmatively shown that the trial court relied on her dispositional-phase testimony to reach its adjudication-phase judgment. The trial court's

adjudication-and-disposition entry is a single document that addresses both subjects, but it does not expressly indicate what evidence was used to reach each conclusion. The entry states, just before announcing the adjudication judgment, that the court *received* the testimony of the caseworker and mother, but it does not state that it *considered* mother's testimony in reaching that conclusion. Moreover, the trial court's oral pronouncement at the conclusion of the adjudication phase emphasized that the reasons for its conclusion were the children's behavioral issues and mother's failure to complete her case plan.

{¶52} To be sure, "a court of record speaks only through its journal, and not by oral pronouncement." *Pettit v. Glenmoor Country Club, Inc.*, 2012-Ohio-5622, ¶ 27 (5th Dist.). This is not, however, a case "where [the] journalized order and the trial court's comments from the bench are contradictory[.]" *Id.* Instead, we view the trial court's oral pronouncement here as clarifying what information it considered in reaching its conclusion.

**{¶53}** Mother has not demonstrated that the trial court relied on impermissible evidence in reaching its conclusion. Her third assignment of error is overruled.

**{¶54}** For the reasons explained above, we affirm the judgment of the trial court.

By: Gormley, J.

Baldwin, P.J. and

Montgomery, J. concur.